Wright, J.
The single point in the case is, whether the defendants’ loss, adjusted before proceedings were commenced to dissolve the company, can be set off against their premium notes given to the company, as a consideration for the policy on the “ Galena ” and other policies. If it can, it is because it is equitable and just to do so, and no rights of third persons intervene. .It may be conceded also, that the plaintiff, as receiver, stands in the same situation that the company itself * would, had the action been prosecuted by it (being in fact insolvent) to recover the amount of the notes.
I suppose, that, ordinarily, rvhen an insolvent insurance company (no mutual relations and obligations existing among its corporators) seeks to enforce payment of a debt owing to such company for insurance premiums or otherwise, the debtor is equitably entitled to set off an adjusted loss due to him against the claim of the company. It would be inequitable, to compel full payment by the *176 debtor, and leave him to lose his debt which had accrued before the insolvency of the company. Here, however, no superior controlling equities would arise, or the rights of others intervene.
It is different, where the company is a mutual one, and the insured a member or corporator (an insurer as well as a party insured) and the association has no dealings in regard to insurances, except with its own members. The party has entered voluntarily into engagagements with others, modifying, or entirely changing, as between themselves, the effect or application of the general rules of law or equity in regard to set-off. In a company of mutual insurers, each sufferer is bound to make compensation as well as to receive it; he occupies a double relation of debtor and creditor, and it would be inequitable, to allow him, when the funds of the company are not adequate to pay all losses, to set off his entire demand; thereby getting more than his share of, and decreasing, a common fund to which all the creditors, pro rata, are entitled. Each member is interested in the premiums as well as losses of all the others, and the premium paid by each is saddled, as'it were, with its proportionate share of the claims of all others. The premium, -whether paid, or secured to be paid, is withdrawn from his control, in contemplation of law, and placed in a common fund, not subject to his claims only, but those of all others in the company; he, in turn, having a similar claim on the premiums of his associates. The members of the association virtual agree to insure each other, and provide a common fund to indemnify in case of loss. As all have contributed to this fund, they have a community of interest in it; and each member having his -proportionate share of the losses, is entitled to his proportionate share of the profits, if any are realized. It may be, that one member may draw from the • premiums paid by other members into the common fund, if the association be prosperous, not only the amount of his losses, but as lirge a *177 proportional share of profits as those whose transactions with the company created no loss at all. In such a case, if insolvency eventually overtakes the association, it would bo highly unjust, to allow him to set off a loss against premiums that happened to be unpaid, and that should be placed in the common fund. Indeed, when the assets of the company are inadequate to the payment of the losses of all its members, the effect of permitting a sufferer to set off his loss in full against his premium notes (which are his contribution to the means of the company) is not only to confer a benefit, without making compensation, but to take from the shares of his associate sufferers in the common fund; to which fund he and they are ratably entitled. Undoubtedly, a premium paid, or agreed to be paid, by a member of a company formed on the mutual principal, must bear its proportionate share of the losses of the company, and cannot be applied exclusively to the individual debt of the party owing or paying it. So long as the company is solvent, no practical injury would result from setting off a loss against the premium; as no preference would be given to one' member or creditor over the others; for all would be paid in full; but if the association were insolvent, to permit the set-off to be made, would be to give an unjust preference to one creditor over the others. In Hillier v. Allegheny Mutual Insurance Company (3 Penn. St. 470), it was adjudged, that the loss of a member of a mutual company cannot be set off to an action brought by the company on his premium note, when the funds of the company were not adequate to pay all losses; and that the plain and practical plan of settling the affairs of an insolvent company of mutual insurers, was to liquidate its means and responsibilities separately.
The defendants in this case became members of a mutual insurance company, by effecting insurance therein. It was one "^of that class- of mutual companies, authorized to commence and transact an insurance *178 business on the cash premiums paid by the associates. The first premiums paid were never to be withdrawn, but were pledged for losses and expenses of the company. The dealers and corporators were to pay their premiums in cash; and such premiums, and the income derived from their investment, were to constitute a fund for the payment of the losses and expenses ef the company. To ascertain the profits of the company, the losses and expenses, after the first year, were annually to be deducted from its earnings, arising as well from premiums as from the income derived from the investment of premiums ; and the balance, if any, was to be deemed the amount of net profits; and, thereupon, every- dealer or insurer was to be credited with snch a proportion of the net balance, as the amount of carped premiiuns paid by him should bear to the whole amount of earned premiums received by the company during the year; and a certificate of profits for the amount so credited was to be issued by the company to such dealer or insurer, with a provision that the amount named therein was liable for any future loss by the company. (Laws of 1841, c. 252; Laws of 1842, c. 132.) The charter, in effect, directed the placing the receipts from premiums together in a common fund, and from this fund the losses, also placed in common, were to be deducted. It is obvious, that each dealer became interested in all the premiums paid by other dealers, as well as in the losses sustained by the company under policies issued to other dealers. It might be, that a party whose dealings with the company resulted in a large loss to it, not only would have his losses paid out of the premiums from others, but actually participate equally with them in the profits to which he had not contributed.
The defendants, when they became dealers and members of the company, instead of paying the premiums in cash, as was contemplated by the charter, gave time notes for such premiums, which could only properly *179 be received by the company in lieu of cash. Had they dealt as the charter contemplated, the question now before us could not have arisen. Now, when the company is insolvent, or unable to pay all its liabilities, instead *of making good their contributions to the mutual fund for the payment of losses and expenses, in which each of the associates have an interest (as they have undertaken to do) and receiving their pro rata share of the means of the company, they seek, indirectly, as creditors, to obtain a preference over their associate creditors. The practical effect of setting off the loss in full on the Galena, would be to exhaust the defendants' contributions to the common fund, for their exclusive benefit, give them, as members of the association, a disproportionate share of the fund, and deprive the other members and creditors of their equal proportionate share. In short, because they have suffered their premium notes to remain unpaid, they are thereby to obtain a preference over their associates. There is no equity in this, as between the associates of a company of mutual insurers.
There is no doubt, that in January 1854, when the loss on the Galena was adjusted, the company was unable to pay all its liabilities; the defendants, in fact, admitted this, by agreeing to be paid the return premium on the policy, “ ratably out of the assets of the company, when divided.” At that time, as members of the company, they contemplated a pro rata division of its means, and agreed to a cancellation of all the policies for which the premium notes were given (including that on the Galena), stipulating for a “ return premium ” on each. It is difficult, however, to perceive how the company could retain or pay back any portion of a premium never received or paid into the common fund. The agreement clearly imported that the defendants should pay their premium notes, or contributions to the common fund, in full, and were to bo entitled to a return of a stipulated amount of such contributions, to be paid, ratably with other credi *180 tors, on a division of the assets of the company. But be this as it may, it was an admission by the defendants, that the association was at that time insolvent, :and -its means inadequate to discharge in full all the claims of its members and creditors. When such a state of things exists in a company of mutual insurer’s, whose members have each an equal interest in its means, and are each creditors as we^ as ^’debtors, to allow one member or creditor to get more than his share of the common fund, by setting off his individual claim in full, and thereby decreasing the shares of his associate creditors, would be unjust and inequitable. Yet, this is the right that the defendants claim they are equitably entitled to. Having voluntarily engaged with others in a mutual enterprise, and for mutual'benefit (the insurance of each other), and each dealer or corporator having an equal interest in the Common fund provided as well for the payment of his losses as for a participation in the profits—they have no equitable right, in case of insolvency, to an exclusive appropriation of their premiums or contributions to the funds of the company, to the payment of the losses under the policies for which such premiums were given; but, as members, aro obligated to pay such premiums into the common fund, and are only justly entitled to their pro rata share of it in the payment of losses.
The referee therefore correctly decided, that the defendants could not set off in full their loss on the “ Galena,” but that they were bound to pay their premium notes, and como in, as they proposed to do in regard to their other claims, in a pro rata division of the assets of the company amongst all its members and creditors. What, as mutual insurers, they were ratably entitled to, could only be ascertained after all the means of this association were called in, and the demands upon it liquidated.
It is said, that the cases in the books relate to mutual fire companies and have no application to marine compa *181 nies. If by this is meant marine companies not formed on the mutual principle, the observation is correct. But there may be mutual companies to make marine insurance, as well as against loss or damage by fire; or they may be empowered to take both species of risks. The company of which the defendants' firm were members was of the latter description. (White v. Haight, 16 N. Y. 310; Laws of 1841, c. 252.)
The judgment of the Superior Court should be affirmed.
Comstock, C. J.
The original corporators of the General Mutual Insurance Company were the persons who should "^present to the commissioners named in the charter, applications for insurance to be effected, amounting to at least $500,000. When applications should be received to that amount, the company was allowed to organize by choosing .trustees; all persons ■taking policies were to become members, as well as all - persons holding certificates of losses under policies issued. The company was to have no subscribed capital; its entire capital was to consist of premiums on insurance, and the profits arising from the investment of those premiums; ’ the capital thus to be constituted could not be withdrawn, ■until it reached $500,000. All net profits over that amount were subject to division amongst those who took insurance and paid premiums thereon, and the division 'was to be made on fro rata principles; the share of each member being represented in certificates of profits. The net profits were to be arrived at, annually, by striking the balance between the premiums earned during the previous year, and the income from investments, on the one side, and the amount of losses and expenses during the same year, on the other. The certificates of profits •could not be redeemed, until the accumulated profits of the company should amount to half a million of dollars, and then only the excess could ever be applied to that ■purpose. All the net earnings of the companjT, there *182 fore, not exceeding that sum, formed the capital, which, in case of insolvency, must be applied to the payment of debts; and this capital was to be contributed by the members, in the form of premiums on their policies.
The charter says nothing of subscription or premium notes or of notes of any kind; it speaks of premiums only; every person taking a policy was bound to pay the established rates of insurance. Doubtless, the company might give him a credit and take his time obligations; any insurance company can do so, if not prohibited by law. But if such was the course of dealing in this company, the notes taken nevertheless represented the cash which the insured was bound to pay as the consideration of his policy, and they constituted as much a portion of the capital of the company, as if the money had been paid. The notes were to be reckoned as part of the earnings in each' year, because they ^"represented the pre*miums of that year. Those who gave them were entitled to all the privileges of membership, as much as those who paid a cash consideration for their insurances. (Charter, Laws of 1841, c. 229; amended, Laws of 1842, c. 138.)
The defendants, in the year 1853, took various policies or renewals of policies from this company, the premiums on which amounted to $2422.50. Instead of paying these premiums in cash, their notes therefor, at one ye.ar, were accepted by the company. According to the principles of the charter, this sum "was the contribution made by them to the capital of the corporation; which, in the event of insolvency, all the creditors were equally entitled to. If the defendants had made this contribution in cash, it is quite clear, they could not withdraw any portion, to apply on the debt due from the company to them; they were creditors in respect to the losses sustained under their policies; they were also debtors in respect to their notes. But they held still another relation, to wit, that of members of the company and contributors to its capital; their notes *183 represented that contribution. They are in no better situation than other members, in consequence of having failed to pay their premiums in money. Whatever form their contributory share in making up the fund assumed, the amount was irrevocably pledged to the payment of debts, until that and all like contributions from other insured parties reached the net sum of $500,000 over all losses and expenses; and on a final division, if one should ever be made, after paying all debts, the entire fund thus constituted and consolidated would be paid out upon the certificates of profits held by the members. I consider it plain, therefore, that the rules of set-off between debtor and creditor have no application to this case. The defendants are entitled as creditors to have their losses paid, if there are assets enough to pay all the debts of the corporation; but to allow them to set off their notes against those losses, would, be to suffer them to withdraw so much of the capital and apply it to their own peculiar benefit. This they have no better right to do, than any other member has to subtract the portion which he may have contributed, whether in cash or time obligations. A creditor of a corporation who is also a ^stockholder cannot demand from the corporation the portion of the capital which he has paid in, and apply it to the extinguishment of the debt; if notes are substituted for cash, in making up the capital, the result is still the same. The defendants became stockholders, so far as such a company can be said to have stockholders, by giving their notes for the amount of their premiums; in respect to those notes they were more than mere debtors. These obligations, accepted as their contributory share of the capital, entitled them to all the rights and privileges of membership; like every other member of a moneyed or trading corporation, they took the chances both of gain and loss. If we allow them the set-off which they demand, we virtually relieve them from the hazard of loss, because we separate from the fund and return to them all *184 their interest in the common adventure. The result is, they must come in" with other creditors in respect to the losses under their policies; they have an equal right with the other creditors to be paid out of the assets which went into the hands of the receiver, and the rights of such creditors are in all respects equal to theirs. In the administration of those assets, they will be benefited by the contributions which other members óf the company made to its capital, and they should derive a like benefit from the mutual relations established by the charter. These reciprocal benefits cannot depend on the accident of notes being given for premiums, instead of payment in cash, nor on the accident of the note of one dealer or member becoming due and being paid before that of another.
The result is, that the plaintiff was entitled to recover on the notes in question, without set-off for losses. The judgment should therefore be affirmed.
Judgment affirmed.