[Civ. No. 11037. First Appellate District, Division Two.—May 25, 1939.]

E. FORREST MITCHELL, Insurance Commissioner, as Liquidator, etc., Respondent, v. PACIFIC GREY-HOUND LINES, INC., et al., Appellants.

H. C. Lucas, Bryce P. Gibbs, Martin Minney, Jr., and Heller, Ehrman, White & McAuliffe for Appellants.

Daniel W. Burbank and Burbank & Laumeister for Respondent.

Sheridan Downey and Sheridan Downey, Jr., as *Amici Curiae,* on Behalf of Respondent.

SPENCE, J.—Plaintiff, acting as the liquidator of California Highway Indemnity Exchange, brought this action against the defendant subscribers of said exchange, seeking a declaratory judgment declaring among other things the method to be employed in determining the liability of the subscribers. From the judgment entered by the trial court, defendants appeal.

The California Highway Indemnity Exchange was a reciprocal or interinsurance exchange organized under the act of 1921 known as the Reciprocal or Interinsurance Act. (Stats. 1921, p. 1599.) Said act will be hereinafter referred to as the "reciprocal act". On June 19, 1931, plaintiff was appointed by the superior court as liquidator thereof. In the liquidation proceeding, the court found that the organization was insolvent, having an excess of liabilities over assets estimated at approximately $890,000. The decree ordered that the business be liquidated and that the liquidator take possession and act "for the benefit of its policyholders, its creditors and the general public". All creditors were restrained from bringing any action without permission of the court. Thereafter, the liquidator was instructed by the court in which the liquidation proceeding was pending to bring this action for declaratory relief. The action was brought against defendant subscribers on the theory of virtual representation of all of some 65,000 subscribers and purported

to settle certain questions common to all of the subscribers under the common form of contract and power of attorney of each subscriber.

On this appeal from the judgment in the declaratory relief action, defendants have made a collateral attack upon the order appointing the liquidator and have also attacked the provisions of the judgment relating to the manner of computing the liability of the subscribers. It therefore appears appropriate to summarize certain of the pertinent provisions of the act under which the exchange was organized, of the written instruments used in the conduct of the business of the exchange, and of the act under which the liquidation proceedings were instituted.

The Reciprocal or Interinsurance Act of 1921 (Stats. 1921, p. 1599), is entitled "An act providing for the organization and regulation of reciprocal or interinsurance exchanges . . . " It authorized "subscribers" to exchange interinsurance contracts with each other and states, "The organization under which such subscribers so exchange contracts shall be termed a reciprocal or interinsurance exchange, hereinafter referred to as the exchange." (Sec. 1.) It authorizes the execution of contracts of insurance by an attorney-in-fact for the subscribers and permits the power of attorney to impose "restrictions upon the exercise of the power granted as may be agreed upon by the subscribers, including the right to fix the contingent liability of the subscriber for the payment of losses in excess of the available cash funds in the possession of the exchange, and may further provide for the exercise of any right reserved to the subscribers directly or through a board or other body. . . . " Such board or other body is given "supervision over the finances of the exchange and over its operations to the extent that said operations shall be in conformity with the subscriber's agreement and power of attorney". (Sec. 2.) A declaration is required to be filed with the insurance commissioner setting forth various required facts including the name under which contracts are to be issued, which name must not be confusingly similar to that of any other insurance organization; the location of the principal office of the exchange; the execution of contracts by a minimum number of subscribers and the possession of the required minimum assets. (Sec. 3.) It also requires that a written instrument be filed authorizing service of process on the attorney-in-fact or upon the

insurance commissioner which service is made "binding upon all subscribers exchanging at any time reciprocal or interinsurance contracts through such attorney". A judgment rendered following such service is made "binding against any and all subscribers as their interests appear". It also provides that "The exchange may sue or be sued in its own name. . . . " (Sec. 4, subd. a.) A bond is required of the attorney-in-fact, which bond may be sued upon by the subscribers or "in case of liquidation or receivership, by the receiver or trustee in liquidation" of the exchange. (Sec. 4, subd. b.) Certain amounts of cash and securities are required to be maintained and "If at any time the assets so held in cash or such securities shall be less than the reserves as required . . . , the subscribers or their attorney for them shall make up the deficiency within thirty days after notice from the insurance commissioner so to do . . . " The return of savings to subscribers is permitted when "such returns do not constitute an impairment of the assets or reserves to be maintained as herein required". Annual reports are required and it is provided that, "The assets, business affairs and records of such organizations shall be subject to examination by the insurance commissioner at any reasonable time. . . . " (Sec. 6.) Provision is made for the licensing and the renewing of licenses by the insurance commissioner. (Sec. 8.) Various penalties are provided including the suspension of revocation of licenses in the event of failure to comply with all the provisions of the act. (Secs. 9 and 10.) The fees and annual taxes upon the "gross premium deposits collected from subscribers" are the same as those paid by mutual companies. (Sec. 11.) Provisions and conditions in the policies required by the reciprocal plan are permitted provided they are not in conflict with the laws of the state. (Sec. 12.) It is further provided that "Except as herein provided, the making of contracts as herein provided for and such other matters as are incident thereto shall not be subject to the laws of this state relating to insurance unless they are therein specifically mentioned", but that the provisions of the act shall not be construed as depriving the insurance department " of the right of examination of and supervision over reciprocal or interinsurance exchanges, their agent and brokers. . . . " (Sec. 13, subd. a.) Rebates, as therein defined, are prohibited. (Sec. 13, subd. b.)

The insurance commissioner had issued a license under said act to ''California Highway Indemnity Exchange of Los Angeles, California, represented by Automobile Underwriters, Inc. of Los Angeles, as its attorney-in-fact, to transact business of liability and automobile insurance, on the interinsurance plan, within this state''. Thereafter the exchange was in operation for many years, using a common form of subscriber's agreement and power of attorney which was executed by each subscriber at the time of making application for insurance.

The instrument so executed was entitled ''Subscriber's Agreement and Power of Attorney''. The subscribers thereby appointed Automobile Underwriters, a corporation, as the attorney-in-fact ''for us, and in our name, place, and stead, or in the name of the Exchange'' to exchange indemnity with other subscribers and to conduct generally the business of the exchange including the execution and cancellation of contracts, called policies. (Par. 1.) It provided that the attorney should have no power to make the subscribers ''jointly liable with any other subscriber'' and that every liability incurred by the subscriber should be ''several and not joint and is to be limited as herein provided''. (Par. 2.) The attorney was authorized to deduct and retain thirty per cent of all moneys received, out of which said attorney was to defray ''all expenses incident to conducting the exchange of indemnity hereunder, except license fees, taxes, excess insurance, reinsurance, legal, loss claims, preventative and Advisory Board expense''. (Par. 3.) An advisory board of five subscribers was created (Par. 4), to ''have supervision of subscribers' funds and all such funds shall be deposited in a bank or invested in securities, approved by it. . . . After the determination, adjustment or compromise of any loss, claim, or expense, chargeable against subscribers, by our Attorney as above provided, the Advisory Board and our Attorney are hereby authorized and instructed to pay our portion thereof''. (Par. 5.) The subscribers agreed to accept the policies issued pursuant to their applications and to pay an amount equal to twenty-five per cent ''of our total basic annual deposit'' and to pay monthly eight and one-third per cent of the ''total basic annual deposit''. Savings were to be returned to the subscribers, when available, whenever the Advisory Board and attorney might determine. (Par. 6.) It was also provided that ''We

hereby subscribe, subject to the call of the Advisory Board, a sum equal to our total basic annual deposit, to pay excess losses incurred under this contract''. (Par. 7.) The agreement was limited to the purpose therein expressed and could be terminated by the subscriber or attorney upon five days' notice. (Par. 8.)

The application accompanying the subscribers' agreement and power of attorney was addressed to the ''California Highway Indemnity Exchange''. On the outside of the policies, or contracts of indemnity, were the words ''Automobile Policy—California Highway Indemnity Exchange''. The body of each policy was headed ''Subscribers at California Highway Indemnity Exchange'' and each policy was countersigned by the attorney-in-fact. Said policies provided for cancellation by the subscriber or attorney upon five days' notice and the return of the ''unused portion of the deposit''. (Par. 10.) It provided, ''It is understood and agreed that the indemnity granted by each participating subscriber, as if a separate contract were issued therefor, shall be that proportion of the aggregate indemnity granted hereunder that such subscriber's basic annual deposit bears to the aggregate of all basic annual deposits under contracts in effect and participating in such loss, at the time of the loss''. (Par. 12.) It also provided that no action should lie against the attorney or any subscriber to recover on any loss unless brought by the subscriber himself and ''within ninety days after the right of action accrues as herein provided . . . '' (Par. 13); and further that no action should be maintained under the policy ''against more than one of the subscribers at any time''; that the attorney was authorized to ''receive and admit service''; and that ''a final decision in such suit . . . shall be taken to be decisive of a similar claim . . . against each of the other subscribers, absolutely fixing his liability in the premises. . . . '' Par. 14.)

From what has been said, it is apparent that a reciprocal ''organization'' differs in many respects from the ordinary stock or mutual insurance company. It has no stock and no capital as such. Its operating funds consist of the premiums paid for its policies and the earnings on any investment of those premiums. The contingent liability of the subscribers (Sec. 2) to pay sums in addition to their premiums stands in the place of the capital of the stock company and the liability of the subscribers to meet such contingent liability

may be likened in some respects to the liability to pay unpaid stock subscriptions to a stock company. The plan appears to be designed for those who desire to assume the positions of both the insurer and insured with a view to eliminating that part of the ordinary insurance premium which goes into profit. As rates for automobile insurance are not fixed by law in this state but by the insurer, it is clear under the plan that the subscribers delegate this duty of fixing rates to the attorney and that the subscribers face the risk that the rates fixed by the attorney may be inadequate. If the rates so fixed are inadequate, it is clear that the plan contemplates that the contingent liability will arise. It will be noted that section 2 of the act gives the right to limit "the contingent liability for the payment of losses" but not for other expenses; also that paragraph 7 of subscribers' agreement and power of attorney limited the subscription to pay "excess losses", to a sum equal to "our total basic annual deposit".

Turning to the so-called liquidation act (Stat. 1919, p. 265), we find that there are but few provisions which need be mentioned in this discussion. The title of said act reads, "An act to provide for proceedings against and liquidation of delinquent insurance corporations and associations". Section 1 provides, "This act shall apply to all corporations and associations which are subject to examination by the insurance commissioner, or which are doing or attempting to do or representing that they are doing the business of insurance in this state . . . ; and the words 'corporation' or 'corporations' herein shall also include all such associations, as well as all voluntary or unincorporated associations; . . . " The word "corporation" is thereafter used throughout the act in the sense above set forth. The procedure for liquidation is set up in section 4 of the act, which also provides, "The rights and liabilities of any such corporation, and of its creditors, policyholders, stockholders and members, and of all other persons interested in its assets, shall, unless otherwise directed by the court, be fixed as of the date of entry of the order directing the liquidation. . . . " Section 11 of the act relates to the service of the order to show cause and other papers and provides for the manner of service when the officers of a corporation "or, if a Lloyds association or inter-insurance exchange be named in the order to show

cause, the duly designated attorney-in-fact, have departed from the state or keep themselves concealed therein. . . . ''

The complaint in the present action set forth the essential facts including those relating to the necessity for bringing the action on the theory of virtual representation. It was alleged therein that said exchange was composed of several thousand subscribers; that the questions involved were of common and general interest to said subscribers; that it was impractical to bring all of said subscribers before the court; and the defendants were named as representatives of all of the subscribers as a class for the purpose of determining the rights and liabilities of said subscribers as a class. It was further alleged that a controversy existed in that defendants and certain other subscribers denied liability for any assessment or for any sums in addition to the premium deposits called for in their contracts and also claimed that they were entitled to set-off against their liability, if any, the sums expended by said subscribers in the payment of losses upon risks covered by their contracts. It was therefore sought to have the liability of the subscribers declared; to have the method determined for computing the liability of the subscribers; and to have a declaration that said subscribers were not entitled to offset against said liability any sums paid out for losses upon the risks covered by their contracts.

Defendants denied many of the allegations of the complaint and set forth certain affirmative allegations. The issues, however, were narrowed upon the trial by admissions that defendants had been subscribers for varying periods prior to August, 1930; that each subscriber had agreed to deposit a basic annual premium and to pay a sum equal thereto to pay excess losses; that the relative liability of subscribers was that proportion which the individual subscriber's basic annual deposit or earned premium bore to the aggregate of all basic annual deposits or earned premiums; that the ''basic annual deposit'' meant the total earned premium on each contract; and that a subscriber did not escape liability for losses while he was a subscriber by withdrawing from the exchange. Defendants nevertheless claimed that the order appointing the liquidator was a void order; that there was no liability on their part which could be enforced by the liquidator by way of assessment; that if any liability did exist, it should be computed on a day to day basis; that the time

had expired within which their liability, if any, could be enforced; that they were entitled to a set-off against the liability, if any; and that the theory of virtual representation could not be applied.

The trial court found and concluded among other things that plaintiff was the duly appointed liquidator; that each subscriber had agreed to pay a sum equal to the subscriber's total basic annual deposit to pay excess losses incurred under the contract; that the terms "total basic annual deposit" and "basic premium deposit" were synonymous and were intended to mean "the total annual earned payments agreed to be paid by the insured subscriber under each contract of indemnity"; that an actual controversy existed regarding the rights and duties of the subscribers and the rights and duties of plaintiff to enforce payment from the subscribers; that the questions involved in said controversy were of common and general interest to all subscribers; and that the defendants were representative of all subscribers for the purpose of determining such questions. It further found and concluded plaintiff became vested with all property, contracts and rights of action of the exchange as of June 19, 1931; that the rights of the exchange and of all persons with respect thereto became fixed as of that date; that all subscribers within four years prior to the decree of liquidation became liable for assessment to pay proportionately both losses and other expenses assumed under their contracts; that the liability of each subscriber for unpaid losses in each year of his membership was limited to an amount in addition and equal to the subscribers total basic annual deposit; that the subscribers were not entitled to set off their claims as creditors against their liability as insurers; that for the purpose of computing the liability of the subscribers as insurers, it was in the interest of economy and expedition and in avoidance of unnecessary wastefulness that such liability should be computed in four separate annual periods dating back from June 19, 1931, by determining the unpaid losses and expenses for each of said years and applying "the ratio which the individual subscriber's total annual premium deposit bears to the sum total of all basic annual premium deposits payable by all subscribers for each year"; that plaintiff should report his computations as decreed to the court in which the liquidation proceeding was pending and make application for an order authorizing an assessment upon the subscribers in accordance

therewith; that if any subscriber not named as a defendant had a defense personal to himself, such defense was saved and might be asserted; that jurisdiction should be reserved to the court in which the liquidation proceeding was pending to act upon the application for an order for an assessment and to modify the method of computation as to any subscribers as to whom said court should find that, by reason of special circumstances, an assessment computed as above set forth would operate unequally or inequitably; and that the statute of limitations would not run until such assessment was levied. Judgment was entered accordingly.

■ Defendants contend that the trial court was without jurisdiction to direct the plaintiff to determine the liability of the subscribers as the appointment of plaintiff as liquidator was "in excess of the authority" of the court in the liquidation proceeding. This contention is referred to by defendant as "the major point presented on this appeal". It is in the nature of a collateral attack upon the order of appointment of plaintiff as liquidator and we will assume, without deciding, that the point may be raised on this appeal under the record here presented. We find no merit, however, in said contention. Defendants argue that a reciprocal exchange is not an entity but a mere place for the exchange of insurance contracts which cannot become insolvent and subject to liquidation. We need not enter into an academic discussion as to whether a reciprocal exchange is or is not a legal entity for all purposes. Nor need we discuss the decisions from other jurisdictions involving various statutes relating to reciprocal exchanges. A reading of the reciprocal act and of the liquidation act of this state, which acts are summarized above, leads us to the conclusion that a reciprocal exchange is to be treated as an entity for the purposes of liquidation, as well as for the purposes of regulation and supervision. Said reciprocal act refers to such an exchange as an "organization" (sec. 1), and the California Highway Indemnity Exchange was referred to in its own contracts as "an association". The liquidation act applied "to all . . . associations which are subject to examination by the insurance commissioner, or which are doing or attempting to do or representing that they are doing the business of insurance in this state . . . " The quoted language is quite broad and there can be no doubt that it was intended to treat reciprocal exchanges and all organizations

and associations engaging in the insurance business as entities subject to liquidation. But if any doubt might be said to exist after reading the language of said two sections of the acts, such doubt is entirely dispelled by the reference to the "liquidation of the exchange" in section 4, subdivision (b) of the reciprocal act and the reference to an "inter-insurance exchange" in section 11 of the liquidation act. Defendants point to section 13 of the reciprocal act which provides that "the making of contracts . . . and such other matters as are incident thereto shall not be subject to the laws of this state relating to insurance unless they are specifically mentioned therein". This section has no application to the point under discussion. It refers only to the making of contracts and other matters incident thereto. Furthermore, even if it be given a broader meaning, we have pointed out above that interinsurance exchanges are "specifically mentioned" in the liquidation act. We therefore conclude that the California Highway Indemnity Exchange was subject to liquidation under the liquidation act and that the order appointing plaintiff as liquidator was not in excess of the authority of the court in the liquidation proceeding. This view finds support in *Mitchell* v. *Lay*, 48 Fed. (2d) 79. (See, also, *Irwin* v. *Missouri Valley Bridge & Iron Co.*, 19 Fed. (2d) 300; *McAlexander* v. *Waldbieser*, 207 Ind. 531 [192 N. E. 425]; *W. R. Roach & Co.* v. *Harding*, 348 Ill. 454 [181 N. E. 331].)

Defendants further contend that there is no provision for an assessment either in the reciprocal act or the contracts executed by the subscribers. It may be at once conceded that the word "assessment" is not used in the act or in the contracts, but that fact is not conclusive upon the question of the propriety of the judgment before us. A reading of the briefs shows that defendants do not seriously contend that they had not assumed contractual obligations to pay sums in addition to their annual basic deposits under their contracts. They apparently contend, however, that these obligations on the part of the subscribers were not assets of the exchange; that these obligations were enforceable only by the creditors themselves in actions against the subscribers and were not enforceable by plaintiff, as liquidator of the exchange. They call attention to subsequent legislation expressly authorizing the levy of an assessment upon liquidation of a reciprocal or interinsurance exchange (Insurance Code, sec. 1390 et seq.), and argue that no such authority

existed under the act of 1921 or the contracts of the subscribers.

For the purpose of determining the propriety of the trial court's judgment in the present case, we believe that the reciprocal act, the liquidation act and the contracts of the subscribers must all be read and considered together. When so read, we believe that said acts and said contracts justify said judgment, which, in effect, declared that the subscribers were subject to a limited assessment liability upon liquidation of the exchange. We have heretofore expressed the view that a reciprocal or interinsurance exchange organized under said reciprocal act should be treated as an entity subject to liquidation under the liquidation act. The only possible assets of such an exchange in liquidation are the ordinary assets remaining on hand at the time of liquidation together with the obligations of the subscribers to pay the contingent liability provided in their contracts. We believe that the last-mentioned obligations of the subscribers should be held to be enforceable by the liquidator and should be treated as assets of the exchange in liquidation. To hold otherwise would mean that each creditor would be compelled to bring actions against thousands of subscribers for the purpose of enforcing the several liabilities of the subscribers for their proportionate shares of such creditor's claim. This would tend to make the whole plan provided for the operation of reciprocal organizations impractical and unworkable and would defeat, at least in a large measure, the apparent intent and purpose of the liquidation act in its application to the liquidation of such organizations. We are therefore of the opinion that the trial court properly held that the obligations of the subscribers were enforceable by the liquidator under the acts above referred to and the contracts of the subscribers. (See *Sergeant* v. *Goldsmith Dry Goods Co.*, 110 Tex. 482 [221 S. W. 259 10 A. L. R. 742].) We are further of the opinion that the subsequent legislation found in the Insurance Code on this subject was enacted for the purpose of clarifying the previously existing rights and duties of a liquidator in liquidation of a reciprocal or inter-insurance exchange as well as for the purpose of making certain changes in the law with respect thereto.

Defendants further contend that the trial court's decision as to the method to be followed in determining the subscribers' liability violated their "contractual and statutory

rights". This contention is based upon the fact that the trial court declared that the subscribers' liability should be determined upon an annual basis as above indicated while defendants contend that the subscribers' liability should be computed upon a daily basis. Defendants rely mainly upon the language of section 4a of the reciprocal act which refers to "such proportions as his interest may appear upon the date that the cause of action arose", and also paragraph 12 of the policy, or contract of indemnity, which provided, "It is understood and agreed that the indemnity granted by each participating subscriber, as if a separate contract were issued therefor, shall be that proportion of the aggregate indemnity granted hereunder that such subscriber's basic annual deposit bears to the aggregate of all basic anual deposits under contracts in effect and participating in such loss, at the time of the loss." These provisions, however, must be read in the light of all other provisions of the contracts and of said acts; and the contracts of the parties must be given a reasonable and practical construction and one which is capable of being carried into effect, if that can be done without violating the intention of the parties. (Civ. Code, sec. 1643.)

As we read the contracts of the parties, they were not so clear and unambiguous as to leave no room for construction as claimed by defendants. They contained no detailed specification of a method to be employed in computing the proportionate liability of each subscriber. All contracts of indemnity were written upon an annual basis and for an agreed annual amount, which amount was either a definite amount or a definite amount plus an amount to be subsequently determined upon a mileage basis. The proportionate liability was to be in proportion that a subscriber's basic annual deposit bore to the aggregate of all basic annual deposits. The problem presented to the trial court was to construe said contracts in a manner which would make them reasonable and practical and in line with the apparent intention of the parties. The trial court concluded that this might be done by determining the unpaid losses and expenses for each of the four years preceding the decree of liquidation and applying "the ratio which the individual subscriber's total annual premium deposit bears to the sum total of all basic annual premium deposits payable to all subscribers for each year."

The problem presented was a very practical one. There

were some 65,000 subscribers. It appears that the computations required to compute their several liabilities for each of four annual periods will be a tremendous task involving the expenditure of a large amount of time and money. The testimony showed that the expense involved would increase proportionately as the length of the period for which such computations were made was shortened. It is therefore apparent that if such computations were to be made as to each subscriber for each day of the four-year period, the number of computations required would approach astronomical figures. The cost of making such number of computations would probably exceed the entire amount which could ultimately be recovered from the subscribers on their respective liabilities as thus determined. It cannot be assumed that the parties intended that their contracts should be so construed as to defeat the purpose of the contingent liability clauses whereby they agreed to assume an added liability for the purpose of their reciprocal indemnification.

Somewhat similar situations have been presented to the courts. In some of the cases, mutual companies have been involved but the same reasoning applies here in determining the basis for such computations. In *Lincoln Bus Co.* v. *Jersey Mutual Cas. Ins. Co.*, 112 N. J. Eq. 538 [165 Atl. 112], the court said at page 114: "The receiver's proposed assessment is for losses by calendar years. It is objected that, as each policyholder is liable only for losses occurring during the life of his policy (*Columbia Fire Ins. Co.* v. *Kinyon*, 37 N. J. L. 33), it is inequitable to levy for losses during a period of the calendar year when he was not a member. The policy years of the 2400 policies overlapped. There were daily additions and withdrawals. Over 700 claims have been filed with the receiver; several hundred claims are in litigation, and others may yet be instituted. The accounting work in connection with the preparation of this assessment is a volume of many pounds and represents an investment of probably $10,000. If the objectors' assessment theory be adopted with respect to every loss which has been sustained, the amount realized from the assessment will not be sufficient to pay for the accounting services required to levy the assessment. In an assessment as we have here, such an exactitude would defeat assessment. It is sufficient, if the assessment is based upon a fair method of calculation, is equally applied, and is sub-

stantially correct. . . . The plan of the receiver is approved."
(See, also, *Swing* v. *Karges Furniture Co.*, 123 Mo. App. 367
[100 S. W. 662]; *Stoddard* v. *Manzella*, 123 Misc. 672 [206
N. Y. Supp. 140]; *Fishback* v. *Bothell Bus Co.*, 150 Wash.
49 [272 Pac. 67].)

In *Fishback* v. *Bothell Bus Co., supra,* the computations
had been made upon a monthly basis and it was argued that
they should have been made upon a daily basis. The court
there said at page 70: "But the statute must be given a prac-
tical meaning. The testimony in this case shows without any
contradiction whatever that a vast amount of time has been
necessarily spent by the department, with all its knowledge
and experience in such matters, in working the matter out on
the plan adopted. It also further shows that, while the techni-
cal plan suggested by appellant of a day to day period, rather
than monthly periods, where there are altogether thousands
of outstanding policies, dating from noon on the day of execut-
ing the policy, and the consequent necessity of ascertaining
whether a given loss occurred before or after noon would be
an almost limitless task, necessitating an expense nearly 30
times the cost of the present plan, which in this case would
equal or exceed the outstanding liabilities and hence would
be unreasonable and impractical."

We therefore conclude that the trial court properly con-
strued the contracts so as to make them reasonable, practical
and workable and that said construction is in line with the
intention of the parties so far as their intention may be
gleaned from their contracts.

Under the same headings, defendants make reference
to the statute of limitations. They claim that their liability,
if any, is upon contract and "any action to enforce such lia-
bility must be brought within four years from the date upon
which the right of action accrued". Their argument is based
largely upon the claim that the liquidation act "has no ap-
plication to the affairs or obligations of subscribers at a de-
funct reciprocal exchange". We have heretofore held that
this argument is untenable. The liquidation act provides that
unless otherwise directed, the rights of all persons shall
"be fixed as of the date of entry of the order directing the
liquidation". The court in the liquidation proceeding re-
strained the bringing of any actions thereafter and limited
the effect of its judgment to those losses and expenses incurred

within four years prior to the order directing the liquidation and to those persons who were subscribers within that period. The provisions of the liquidation act were in effect at the time the subscribers' contracts were made and must be read into said contracts. We are therefor in accord with plaintiff's contention that in view of the provisions of said act, the right of action of the liquidator to enforce the liability of said subscribers will not arise until the assessment is ordered by the court in the liquidation proceeding. (See *Fishback* v. *Lewis*, 170 Wash. 39 [15 Pac. (2d) 658]; *Langworthy* v. *Garding*, 74 Minn. 325 [77 N. W. 207]; *Conway* v. *Northside Lumber Co.*, 141 Misc. 231 [252 N. Y. Supp. 476].) Defendants also call attention to the provisions of paragraph 13 of the policy or contracts of indemnity, providing for a limitation of "ninety days after the right of action accrues". It seems entirely clear from a reading of said paragraph that it refers only to actions "brought by the subscriber himself . . . for moneys actually paid by him in satisfaction of a judgment" and contemplates actions brought while the exchange is a going concern and not to an action brought by a liquidator appointed to liquidate such an exchange.

It is further contended by defendants that the doctrine of virtual representation finds no application in the instant case. We do not believe any extended discussion of this contention is required. This appears to be a typical case for the application of said doctrine. Section 382 of the Code of Civil Procedure states, " . . . when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all". (See, also, 20 Cal. Jur. 482, sec. 7; 3 Cal. Jur. 358, sec. 10.) There were several questions involved which were of common and general interest to all subscribers. Said subscribers were numerous and it was impracticable to bring them all before the court. But in any event, we do not believe this question may be effectively raised by defendants as they have not shown any prejudice to themselves by reason of the application of said doctrine.

The final contention of defendants is that they are entitled to off-set against any liability as subscribers their claims as creditors of the exchange for money expended by them in defense and settlement of certain claims covered by

their contracts of indemnity. They rely upon agreements made with the attorney-in-fact and a provision in two *ex parte* orders made by the court in the liquidation proceeding. Further facts should be stated in the consideration of this contention.

In 1930, Mr. Wren owned all the stock and was president of Automobile Underwriters, the attorney-in-fact corporation of the California Highway Indemnity Exchange. He was also vice-president and chairman of the executive committee of defendant Pacific Greyhound Lines, Inc., the operating company, and held various executive offices in Pacific Greyhound Corporation, the holding company, and in various subsidiaries of the operating company. The exchange was under examination by the insurance department in July, 1930, and on July 15, 1930, defendants canceled all their policies effective August 1, 1930. Mr. Wren received the report of the examination on August 29, 1930, and he discussed the insolvency and the question of assessment with the insurance department on September 3, 1930. He stated that ''the stage companies would be willing to take up their share of the deficiency''. The report showed the insolvency of the exchange as of May 31, 1930, and the insurance commissioner, on February 5, 1931, demanded that the deficiency be repaired within thirty days. In the meantime the defendant stage companies had discussed the question of possible set-off with the attorney-in-fact and in written set-off contracts, dated February 28, 1931, and March 1, 1931, the purported set-off agreements were made with the attorney-in-fact. It was recited therein that the exchange ''is unable to pay all of the losses . . . in excess of the cash funds in the possession of the exchange and will in the near future levy an assessment''. In one of the contracts, reference was made to the exchange's ''insolvent condition'' but this language was deleted from the contract some two months after the execution thereof. The insurance commissioner suspended the exchange's license on March 2, 1931, and thereafter the decree of liquidation was entered on June 19, 1931.

Thereafter defendants filed two petitions with the court in which the liquidation proceeding was pending. The petitions and the *ex parte* orders granted thereon were quite similar. One petition was entitled ''Petition'' while the other was entitled ''Petition for Permission to Settle or Defend

Certain Suits at Law Now Pending Against Petitioners''. These petitions were filed primarily for the purpose expressed in the last-mentioned title as the contracts of indemnity prohibited the subscribers from voluntarily assuming the defense of any claim or incurring any expense. The exchange was insolvent and defendants had some 59 actions then pending against them. The petitions set forth the facts and prayed for permission to have all files of the exchange relating to said claims made open to their inspection; for ratification of the acts done by defendants in assuming the defense of said claims; and for the right to proceed to settle, defend and satisfy said claims. No mention was made in said petitions of the above-mentioned set-off agreements. Defendants denied in said petitions that they were liable for assessment. They nevertheless asked in the prayers of said petitions that in the event that they were adjudged liable for assessment, they be permitted to offset their expenditures on claims against their assessment liability. The *ex parte* orders, granted upon said petitions, followed closely the prayers of the petitions but made no mention of said set-off agreements. Said orders did provide, however, that ''all payments . . . may be set-off by petitioners, *subject to the approval of the court as to reasonableness,* in the event that it shall be judicially determined that petitioners are liable for the levy of assessment . . . ''. (Italics ours.) Thereafter the court in the liquidation proceeding directed the bringing of this action in declaratory relief involving among other things the question of the right of set-off. In this action, defendants claimed the right to set-off all expenditures made by them against any assessment and asked for a declaration of that right.

The trial court here found ''that said petitions were presented to said court, *ex parte,* and that the liquidator received no written notice of motion and was not present or represented at the time of the application for either of the orders; that the orders so made were not, and are not positive or mandatory in terms, but provide merely that expenditures so incurred 'may be set-off by petitioners subject to the approval of the court as to reasonableness'. And this court now finds that the allowance of any such set-off would be, and is unreasonable, inequitable and unjust toward other subscribers and that it would place the Pacific Greyhound Lines in the

position of preferred creditors at the expense of all other subscribers, and would not be and is not, in accordance with the law applicable in the premises.''

The trial court further found that defendants had expended money for said purposes and had filed creditors' claims therefor in the liquidation proceeding; that at the time the set-off agreements were made, the exchange was insolvent and was unable to pay losses and expenses; that the parties to said agreements anticipated the possibility of an assessment against the subscribers to make up the deficiency in assets; that the executive officers of defendants knew that the exchange was insolvent at the time of making said agreements; that the attorney-in-fact was without authority to make said agreements and that said agreements were made without the consent or approval of any other subscribers. The judgment entered by the trial court was to the effect that neither the susbcribers in general nor defendants in particular were entitled to offset any claims as creditors against their liability as insurers.

Defendants do not attack the sufficiency of the evidence to support the trial court's findings relating to the subject of set-off and we. are of the opinion that said findings support the portions of judgment of the trial court relating thereto. It has been held that where a mutual insurance company becomes insolvent a policyholder is not entitled to set-off his claim as a creditor against his liability as an insurer. (*Lawrence* v. *Nelson,* 21 N. Y. 157; *Hillier* v. *Allegheny Mutual Ins. Co.,* 3 Pa. St. 470 [45 Am. Dec. 656]; *Stone* v. *Old Colony St. Ry. Co.,* 212 Mass. 459 [99 N. E. 218].) We are of the opinion that the same principle should be applied in case of the insolvency of a reciprocal or interinsurance exchange. It seems entirely clear that the effect of the purported setoff agreement would be to grant to the defendants an advantage over other subscribers and creditors and that the trial court properly held that said purported contracts were in excess of the authority of the attorney-in-fact. Nor can the right of setoff be predicated upon the orders of the court in the liquidation proceeding for the portions of said orders relating to set-off were specifically made "subject to the approval of the court as to reasonableness". As above stated, the trial court found that "the allowance of any such

set-off would be and is unreasonable, inequitable and unjust toward other subscribers''.

The judgment is affirmed.

Nourse, P. J., and Sturtevant, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on June 24, 1939, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 24, 1939. Curtis, J., and Edmonds, J., voted for a hearing.