FARMERS AUTOMOBILE INTER-INSURANCE EXCHANGE and FARMERS UNDERWRITERS ASSOCIATION, a Corporation, Attorney-in-fact for Farmers Automobile Inter-Insurance Exchange, Plaintiffs and Respondents,

v.

ALEX MacDONALD, as Insurance Commissioner of the State of Wyoming, Defendant and Appellant.

(No. 2252; Aug. 31, 1943; 140 Pac. 2d 905)

354

For the defendant and appellant there was a brief by Ewing T. Kerr, Attorney General; Harold I. Bacheller, Deputy Attorney General; and Arthur Kline, Assistant Attorney General of Cheyenne, and oral argument by Mr. Kline.

For the plaintiffs and respondents there was a brief by Ellery and McClintock of Cheyenne, Wyoming, and oral argument by Mr. A. G. McClintock.

## OPINION

RINER, Justice.

In this case the Insurance Commissioner of the State of Wyoming, Alex MacDonald, hereinafter designated as the "Commissioner" or the "defendant" seeks by direct appeal the review of a declaratory judgment of

the District Court of Laramie County in favor of Farmers Automobile Inter-Insurance Exchange and Farmers Underwriters Association, a corporation attorney-in-fact for the party last above mentioned. That party will usually be hereinafter referred to as the "Exchange" and the Farmers Underwriters Association as the "Underwriters" or the "Attorney". The Exchange and Underwriters when both are mentioned together may also be designated as the "plaintiffs" as they were aligned in the court below.

The plaintiffs brought this action in the district court aforesaid to obtain a declaratory judgment to the effect, in substance, that the Exchange is a "foreign unincorporated insurance association" within the intent and meaning of the term "Association" as used in Section 57-424 W. R. S. 1931; that said Exchange has the necessary "capital" required by said section and is not lacking any of the qualifications required by the law of this state for the admission of a foreign unincorporated insurance association to transact its insurance business therein; and that the Commissioner should, upon examination of the material submitted with its application therefor, issue to said Exchange a license to transact such business in Wyoming. The Commissioner in his answer, to review his pleading briefly, denies that the Exchange is an "association" and has the necessary "capital" within the scope and meaning of said Section 57-424 W. R. S. 1931 and states that he has rejected plaintiffs' application on the ground that "a reciprocal or inter-insurance Exchange is not authorized to do business in the State of Wyoming under the laws of this state." The answer also alleges in detail that after such rejection by the Commissioner, the Exchange caused Senate File No. 42 to be introduced in the 1941 legislature of this state, "wherein the said plaintiff sought to have amended and re-enacted Section 57-424, Revised Statutes of Wyoming, 1931, which

said Bill, if passed by the Twenty-sixth Legislature of the State of Wyoming, and if approved by the Governor, would have authorized said plaintiff to carry on and transact business in the State of Wyoming," with the result that the said Senate File was on third reading rejected by that body thereby construing said Section 57-424 as not to permit the Exchange to do business in Wyoming; further, it is averred by the defendant that any company, association, or partnership organized for the purpose of transacting and carrying on in this state the business .of insurance must have and possess the sum of "not less than $200,000 actual paid up capital exclusive of any other assets which said company, association or partnership may have; that said plaintiff does not have any capital stock in any sum whatsoever."

The District Court of Laramie County declared by its judgment that the Exchange is included within the meaning and intent of the term "Association" in the said Section 57-424, has the "capital" required by that section and that said Exchange "does not lack any of the qualifications imposed by the statutes of Wyoming as a condition precedent to the admission of a foreign unincorporated insurance association to the State of Wyoming for the purpose of transacting therein its insurance business."

The pertinent portion of Section 57-424, supra, reads:

"It shall not be lawful hereafter for any insurance company, association or partnership organized or associated for any of the purposes specified in this article, incorporated by or organized under the laws of this state or of any other state, or the United States, or any foreign government, directly or indirectly, to take risks or transact any business of insurance in this state, unless possessed of not less than two hundred thouand dollars ($200,000.00) of actual paid up cap-

ital, exclusive of any assets of any such company as shall be deposited in any other states, or territories, or foreign countries, for the special benefit of security of the insured therein except that the requirements as to capital shall not apply to fraternal societies or mutual companies and provided, that any company conducting a surety business shall possess an actual paid up capital of not less than four hundred thousand dollars ($400,000.00), and a surplus of one hundred thousand dollars ($100,000.00) ; and any such company desiring to transact any such business, as aforesaid, by any agent or agents in this state shall file a certified copy of its charter, or act of incorporation, together with a statement under the oath of the president, or vice-president, or other chief officer and the secretary of the company, for which they may act stating the name of the company and the place where located, the amount of its capital stock, if a stock company with a detailed statement of the facts and items as required from companies organized under the laws of this state; * * *"

The Exchange is a type of insurance organization which seems to have come into considerable use of late years and statutes governing such organization may be found in many states. See cases cited in 94 A. L. R. 836 note, and 141 A. L. R. 765 supplementary note. This Exchange, one of the plaintiffs herein, was organized under the laws of the State of California, Chapter 3 Deering's 1937 Codes of California. It exemplifies what is usually designated as "reciprocal insurance" or "inter-insurance". This form of insurance organization presents a "system whereby individuals, partnerships, or corporations engaged in a similar line of business undertake to indemnify each other against a certain kind or kinds of losses by means of a mutual exchange of insurance contracts, usually through the medium of a common attorney in fact appointed for that purpose by each of the underwriters, under agreements whereby each member separately becomes both an insured and an insurer with several liability only." 94 A. L. R. 836 Note.

In order to understand with reasonable clarity the legal background from which the Exchange now seeking admission to do an insurance business in Wyoming originated, it may be well to review to some extent the statutes of its parent state relative to its peculiar type of insurance. The law of the State of California relative to the formation and government of such an organization provided substantially in part as follows: Any persons may exchange reciprocal or inter-insurance contracts with one another providing insurance among themselves against any loss which may be insured against under other provisions of law. Life or surety insurance appears to be excluded from this authorization. Section 1300 of Chapter 3, supra. Such persons are termed subscribers and any corporation organized under California law in addition to the other powers possessed by it may be a "subscriber". Sections 1301, 1302 of Chapter 3, supra. These reciprocal contracts may be executed by an attorney-in-fact, agent or other representative authorized to act for the subscribers under powers of attorney. Such authorized agent is termed "the Attorney" and may, as in the case at bar, be a corporation whose principal office is located at a place designated by the subscribers in the power of attorney. Sections 1305, 1306 of Ch. 3, supra. This power of attorney and the contracts it authorizes may (a) provide for substitution of attorney and revocation of the power; (b) impose such restrictions upon the exercise of the power as are agreed upon by the subscribers; (c) provide for and limit the maximum amount to be paid by subscribers except that the contracts of exchanges writing either liability or workmen's compensation insurance shall be subject to the provisions of this law relative to the assessment of liability and Workmen's Compensation Insurance; (d) provide for the exercise of any right reserved to the subscribers directly or through a board or other body.

The body exercising rights of this character shall be selected under such rules as the subscribers adopt. It shall supervise the finances of the Exchange and supervise its operations so as to assure conformity with the subscriber's agreement and power of attorney. Such body shall be composed of subscribers or agents of subscribers and not more than a third of the members serving on such board shall be agents, employees, or shareholders of the attorney. Sections 1307, 1308, and 1310 of Ch. 3, supra.

The Exchange shall maintain its required assets in any one or more or all of the following forms: (a) In cash or deposits in solvent banks, (b) invested in securities of the kind designated for the investment of assets of incorporated insurers by the laws of the state where the principal office is located, (c) invested in real property acquired by or for it to secure payment of loans heretofore contracted or for moneys heretofore due, or purchased at sales upon deeds of trust or upon judgments obtained for such loans or debts or conveyed to it in satisfaction of debts contracted heretofore, but such real estate held by the attorney must be disposed of within five years after title is acquired unless this time be extended by the Insurance Commissioner of California. If an "Exchange" does either a liability or workmen's compensation insurance business it shall always maintain assets in a sum sufficient to discharge all liabilities and to provide a surplus over all liabilities of $100,000.00. Sections 1370-1371 of Ch. 3, supra. In the event the Exchange does not have assets sufficient to discharge all liabilities and to maintain the required surplus, the Attorney shall make an assessment for the required amount needed to make up the deficiency. The Insurance Commissioner may make this assessment after the attorney fails, within 30 days after order by Commissioner so to do, to act. If liquidation of an exchange is required, the assessment shall be ordered

for such amount as the Commissioner deems necessary to "discharge all liabilities of the exchange including the reasonable cost of liquidation." Every subscriber must pay his proportionate part of any such assessment if he is notified by either the attorney or commissioner of an intention to levy same within one year after the expiration or cancellation of his policy. These assessments are limited, however, and "shall be of no greater amount than specified in the power of attorney" which may limit the contingent liability of the subscriber for assessment, but that liability may not be less than an amount equal to and in addition to the amount of the premium deposit provided in the policy. "All funds of such exchange and the proceeds of the contingent liability of its subscribers shall be available for the payment of any liability of the exchange." Sections 1391, 1392, 1397, 1398 and 1402 of Ch. 3, supra. The Exchange may sue and be sued in its own name and any judgment rendered in such a suit shall be binding upon each subscriber only proportionately to his interest, and a subscriber may not be sued upon any Exchange obligation until a final judgment has been obtained against the exchange and for 30 days remains unsatisfied.

In the case at bar the form of power of attorney fixes the principal office of the Exchange and Attorney in Los Angeles, California. It states that the membership fees and 20 per cent of the premium deposit shall be paid to the Underwriters as its compensation for becoming and acting as Attorney-in-fact and for paying "all taxes, license fees, attorney's fees, and adjustment expenses and charges, expenses of members' and governors' meetings, renewal commissions and such other specified fees, dues, and expenses authorized by

the Board of Governors or its Executive Committee." The Exchange is required to bear all other expense incurred in its conduct, and it is stated that the maximum liability of the subscriber shall not exceed an additional amount "equal to the Premium Deposit provided for the insurance obtained." What the premium deposit or the membership fee is, the record before us does not make clear. Section 3 of Article III of the Rules and Regulations of the Exchange provides in part that:

"The Board of Governors shall have general supervision over the finances of the Exchange and of its operations, to the extent that said operations shall be in conformity with the Subscribers' Agreement and Power of Attorney. The Board shall have power to make and amend these Rules and Regulations and take all action necessary or desirable for the proper transaction and conduct of the business and affairs of the Exchange, not inconsistent with the Subscribers' Application and Power of Attorney."

The insurance policy issued by the Exchange to each of the subscribers thereto contains among other things the following provisions:

"The Premium Deposit for this policy and all payments made for its continuance shall be payable to the Exchange at the Home Office of the Exchange. The funds so paid shall be placed to the credit of the Insured upon the records of the Exchange and applied to the payment of Insured's proportion of losses and expenses and to the establishment of reserves and general surplus. All such funds may be deposited and withdrawn or invested as the Board of Governors or its Executive Committee designates. The Insured agrees that any amount contributed to a general surplus fund out of his premium deposit may be retained by the Exchange and applied to any purpose deemed proper and advantageous to policyholders.

Liability Limited

"The Subscriber's aggregate contingent liability under this policy shall not be more than one additional Premium Deposit."

On March 25, 1940 the subscribers of the Exchange at their annual meeting adopted the following:

"NOW, THEREFORE, for the purpose of complying with the laws of the State of Wyoming respecting paid-up capital,

"BE IT RESOLVED by the subscribers of Farmers Automobile Inter-Insurance Exchange, in regular annual meeting assembled, that they do hereby irrevocably pledge the sum of Two Hundred Thousand Dollars ($200,000.00) of the surplus funds of Farmers Automobile Inter-Insurance Exchange as paid-up capital for the payment of any and all liabilities now, or hereafter to be, incurred by or in the name of said Farmers Automobile Inter-Insurance Exchange; and

"BE IT FURTHER RESOLVED, that the said sum of Two Hundred Thousand Dollars ($200,000.00) be deposited with the Commissioner of Insurance of the State of California, or such other depositary as may be selected by Farmers Underwriters Association, the Attorney-in-Fact of and for Farmers Automobile Inter-Insurance .Exchange, in TRUST for the purpose herein stated; and

"BE IT FURTHER RESOLVED, that the said sum of Two Hundred Thousand Dollars ($200,000.00), pledged as aforesaid, shall not be withdrawn in any manner whatsoever for distribution among members of Farmers Automobile Inter-Insurance Exchange while any liability of said Exchange remains undischarged; and

"IT IS FURTHER RESOLVED that Farmers Underwriters Association as Attorney in Fact of and for Farmers Automobile Inter-Insurance Exchange is hereby authorized and directed to deposit the sum of Two Hundred Thousand Dollars ($200,000.00) of the surplus funds of Farmers Automobile Inter-Insurance Exchange as herein resolved."

The same day the Board of Governors of the Exchange adopted substantially the same resolution "for the purpose of carrying into effect" that resolution.

Concerning the operations of the Attorney, its Vice-

president and general counsel stated as a witness for the plaintiffs that:

"The attorney in fact makes all collections of premiums and disburses it, 80 per cent going into the funds of the Exchange, and 20 per cent is retained by it for the carrying on of all business of the exchange, with sole exception of settlement of claims, which is a burden of the Exchange itself. The attorney does everything: solicits all the business, carries on the underwriting, the execution of all of the policy contracts; in fact, does everything for the Exchange that it could do itself."

The same witness testified concerning the effect of the resolutions aforesaid:

"Q. In other words, if you have an unexpected, heavy loss, you would then draw from this $200,000 which you have referred to as an "irrevocable trust?"—
"A. No, I haven't referred to it as an "irrevocable trust." I call your attention to the fact that it is irrevocable until all liabilities have been paid. That means it is available for the payment of all liabilities."

About June 20, 1940 the Exchange applied to the Commissioner for a certificate of authority authorizing such Exchange to transact the business of insurance in this state which was thereafter rejected by him, his reasons being, as he stated as a witness in his own behalf, that the organization was not a corporation, a partnership or an association, that it had no capital or capital stock as required by Section 57-424, supra, and further that there was no provision of the Wyoming law covering an organization such as an examination of the structure of the Exchange disclosed it to be and "therefore", as he stated, "I could not regulate the activities of the Exchange if it were admitted." It also appears established by the record herein as alleged in the Commissioner's answer that on January 25, 1941 the Underwriters acting on behalf of the Exchange caused to be introduced in the Wyoming Legislature in

the course of its regular 1941 session Senate File No. 42. This bill proposed the amendment and re-enactment of Section 57-424 aforesaid. After setting out that section entire as it appears in W. R. S. 1931, the pertinent part of which is excerpted above, there was added thereto the following:

"If formed to transact business as Inter-Insurer only, by means of inter-insurance contracts between the several parties who are or shall become subscribers and who shall comprise and be recognized as the association, such association shall not transact any business as insurer unless it shall have and maintain at all times assets in a sum sufficient to discharge all liabilities and to provide a surplus over all accrued liabilities of two hundred thousand dollars ($200,000.00), and it must maintain the sum of one hundred thousand dollars ($100,000.00) on deposit for the benefit of all policy holders, in a state of the United States in a depository approved by the insurance commissioner of this state. Such association shall sue and be sued in its own name.

"Any individuals or corporations, public or private, may exchange inter-insurance contracts providing insurance other than life against any loss which may be lawfully insured against. Such contracts may be executed by an attorney in fact, either individual or corporate, duly authorized and acting for such subscribers under a power of attorney. The maximum liability of any subscriber for losses and expenses shall be fixed and determined by the terms of the power of attorney."

This file failed to pass the Wyoming Senate, being defeated on third reading. Other facts will be hereinafter mentioned as the necessity therefor arises.

The contention is made for the Exchange that it is "possessed of not less than two hundred thousand dollars ($200,000.00) of actual paid up capital" as required by Section 57-424 W. R. S. 1931. With this contention we are unable to agree for a number of reasons.

Preliminary to a discussion of this problem, it must

be constantly kept in mind that "it is now generally recognized that the business of insurance is one that is affected with a public interest, and that it is a proper subject of regulation and control by the state by virtue of the exercise of its police power in the interest of public convenience and the general good of the people." 29 Am. Jur., 59-60, § 22. In accord with this general principle, Mr. Chief Justice Taft in Merchants Mutual Automobile Liability Insurance Company v. Smart, 267 U. S. 126, 45 S. Ct. 320, 69 L. Ed. 538 remarked:

"It is well settled that the business of insurance is of such a peculiar character, affects so many people, and is so intimately connected with the common good, that the state creating insurance corporations and giving them authority to engage in that business may, without transcending the limits of legislative power, regulate their affairs, so far, at least, as to prevent them from committing wrongs or injustice in the exercise of their corporate functions."

Referring to the case of German Alliance v. Lewis, 233 U. S. 389, 34 S. Ct. 612, 58 L. Ed. 1011, the same learned authority indicated in National Union Fire Insurance Company v. Wanberg, 260 U. S. 71, 43 S. Ct. 32, 67 L. Ed. 136, that it was "settled" that a state legislature could "regulate the conduct by corporations, domestic and foreign, of insurance as a business affected with a public interest. This includes provision for 'unearned premium fund or reserve, the limitation of dividends, the publishing of accounts, valued policies, standards of policies, prescribing investment, requiring deposits in money or bonds, confining the business to corporations, limitation of risks, and other regulations equally restrictive.' "

And in State of Ohio ex rel. National Mutual Insurance Company v. Conn, 115 Ohio State 605, 155 N. E.

138, 50 A. L. R. 473 concerning the powers of an Insurance Commissioner in the State of Ohio, the court said:

"All these statutes under consideration here are enacted under the police power, and upon the theory that the business of insurance is impressed with a public use and that a governmental agency may properly be created to protect the interests of policy holders. The statutes authorize the superintendent to make examination of insurance companies and to employ inspectors for that purpose, and it would manifestly be a wasteful expenditure of money to employ inspectors to ascertain facts and conditions if the powers and duties of the superintendent were only advisory. Insurance companies may not operate in the state of Ohio without a license, and it necessarily follows that the superintendent of insurance is invested with a measure of discretion in granting or withholding such license."

Section 57-424 W. R. S. 1931, supra, for the most part, came into the body of our law in territorial days for it was, with the exception of some few subsequent amendments, adopted in the year 1877. Originally the amount of paid up capital required was $300,000. The type of insurance exemplified by the Exchange at bar is of comparatively recent origin and so far as we have been able to discover was practically unknown at the time the territorial law aforesaid was enacted. That law was entitled simply "An Act Regulating Insurance *Companies.*" (Laws of Wyoming, 1877 pp. 55, 66, § 23 thereof.) (Italics supplied.)

It seems quite clear to us that when this law was enacted only corporations possessing capital stock were contemplated as structurally entitled to write insurance contracts. An examination of the act of 1877 will, we think, very well establish this fact. The title of the act so indicates as does its many provisions for their supervision, government and functioning. We are aware that there are sections of the act which mention

associations, societies, partnerships, and individuals, but it is significant that no legal machinery is provided for their supervision in connection with the writing of insurance contracts.

When any citizens of Wyoming desired to write insurance agreements they were required to act under the corporate form of government only. See sections 1-22 inclusively of the act aforesaid. A great many of these provisions still remain in substance as they were at that time adopted in the body of our present day law. See article 4, Sections 57-401 et seq. W. R. S. 1931, as evidencing an intention on the part of subsequent legislatures of both territorial and statehood existence to continue the same policy of allowing the business of insurance to be conducted only by incorporated associations.

The law making bodies of this territory and state evidently had in mind what is so obvious to lawyer and businessman alike upon mature reflection that individual and partnership insurance were decidedly impractical because of the uncertainty of proper succession in case of death of an individual, the difficulty of handling matters of this character when estates of individuals should become involved, the ease with which individuals may transfer their property and thus escape liability for losses incurred, and for many other reasons which could be readily suggested. We hardly think after a careful survey of the laws governing the writing of insurance as they now stand on our statute books that the law making body of this state, after regulating the business of writing insurance by corporations so thoroughly and carefully as it has done, intended to leave the door open to individuals, societies, associations and partnerships to transact the same line of business with practically no regulation or supervision at all to protect the public generally. It does not seem reasonable that impecunious or insolvent individ-

uals, societies, associations and partnerships should be allowed to do that in which it is expressly forbidden corporations similarly financially situated should engage.

In Intermountain Lloyds v. Diefendorf, Comr. of Finance, 51 Ida. 304, 5 Pac. (2d) 730, the court construing Idaho C. S. § 4942 held that the legislature of that state by the enactment of that section had adopted the policy of confining the insurance business to corporate entities. Upon examination and comparison we find that section embraces in its language and its requirements substantially the same scope as is found in Sections 57-401, 57-404, and 57-407 W. R. S. 1931. The sections last mentioned with other coordinate provisions of law govern the matter of the formation of an insurance company in this state much more elaborately than the section of the Idaho law just mentioned. Section 57-441 W. R. S. 1931 provides:

"It shall not be lawful for any insurance company, association or partnership organized or associated for any of the purposes specified in this article incorporated by or organized under the laws of any other state or the United States or any foreign government directly or indirectly, to take risks or transact any business of insurance in this state, either by correspondence or through a resident or non-resident agent or agents, without first complying with all the conditions fixed by the statutes of this state under which foreign insurance companies may do business within this state."

The first paragraph of Section 57-422 reads:

"It shall be the duty of the president, or of the vice-president and secretary, of each insurance company organized under this chapter, or incorporated under any laws of this state, *or doing business in this state,* annually, on the first day of January of each year, or within sixty days thereafter, to prepare, under oath, and deposit in the office of the insurance commissioner,

a full, true, and complete statement of the condition of such company on the last day of the month preceding that in which such statement is filed, which last statement shall exhibit the following items and facts, in the following forms, viz.: * * *" (Italics ours.)

There is then set forth in detail the items of the statements required, some fourteen in number. The first four of these are:

"First—The amount of capital stock of the company.
Second—The names of the officers.
Third—The name of the company and where located.
Fourth—The amount of capital stock paid up."

It is obvious that even if the Exchange were admitted to do business in Wyoming, it could not comply with these requirements for it concededly has no capital stock. Neither could it supply a statement of "dividends either in script or cash, specifying the amount of each declared but not due; dividends declared and due," as required to be stated in "sixth" of said statement. The concluding sentence of Section 57-422 reads:

"The insurance commissioner shall withhold the certificate of authority from any such company neglecting or failing to comply with the provisions of this section."

All these matters would seem to point directly to the existence of the corporate form of government as the form designed for the transaction of an insurance business and they refer to domestic and foreign corporations alike and are confirmatory of our view above expressed that the several legislatures thought that insurance should be written only by corporations expressly formed for that purpose.

Of recent years statutes regulating reciprocal insurance have been adopted in a number of states evidently with the idea of protecting the public generally in the use of this type of indemnity. An examination of the

case law dealing with this character of business discloses that bankruptcy and liquidation proceedings have overtaken many organizations of the sort, notwithstanding, as in the case at bar, they have possessed many subscribers in many states and have accumulated large sums in assets. As an example of the stringent provisions now governing this type of insurance in some of the jurisdictions of the Union may be mentioned the law of the state of New York where it is required that *subscribers* to a reciprocal exchange must have assets in an amount not less than $10,000 in excess of liabilities. This requirement upon its validity being questioned was held proper by the New York Court of Appeals. (Hoopeston Canning Company v. Pink, Superintendent of Insurance et al., 288 N. Y. 291, 43 N. E. 49.) And that decision of the state court was recently affirmed by the national court of last resort, ...... U. S. ......, 63 S. Ct. 602, 87 S. Ed. 568 where this was said:

"It is argued that the provision requiring each new subscriber to have net assets of $10,000 violates the equal protection clause, but since each subscriber is also an insurer and other subscribers are dependent on his financial responsibility, there is no reason why the legislature might not think this provision necessary."

In interpreting the operations of statutes, we may appropriately mention just here that it is pointed out by 25 R. C. L. 959, § 215 that there is frequently a tendency to construe laws in the light in which they appear when the construction is given. The text then goes on to say that:

"The true rule is that statutes are to be construed as they were intended to be understood when they were passed. Statutes are to be read in the light of attendant conditions and the state of the law existent at the time of their enactment. The words of a statute must be taken in the sense in which they were understood at the time when the statute was enacted. If the language

used is broad enough to include unknown things which might spring into existence in the future, they would be deemed to come within, and be subject to, the evident meaning of the terms used, but it does not follow, when a newly invented or discovered thing is called by some familiar word, which comes nearest expressing the new idea, that the thing so styled is really the thing formerly meant by the familiar word."

Similarly the Supreme Court of Illinois in Crerar Clinch Coal Company v. City of Chicago, 341 Ill. 471, 173 N. E. 484 said that:

"Unless by the language of a given statute it can be seen that it contemplated a given future development, this court can only ascribe to the Legislature the intention to meet conditions as they existed at the time of the passage of the act. Courts should be liberal in construing the intention of the Legislature as to the adaptation of its statutes to future use where such may reasonably be justified, but it is quite clear that the Legislature in 1911 could not have had in mind that the use of automobiles would or might so increase as to require the regulation of private garages in the interest of the public welfare."

Comparatively recently this court had occasion to make the distinction that:

"It is true that if a statute or an ordinance is broad enough, it will at times be extended to include conditions not in existence and not contemplated at the time of its enactment. 59 C. J. 973, 974; Pellish Bros. v. Cooper, 47 Wyo. 480, 38 P. 2d 607; Equitable Life Assur. Soc. v. Thulemeyer, 49 Wyo. 63, 52 P. 2d 1223, 54 P. 2d 896, 897. But where 'the statute' (or ordinance) shows plainly that the word is not used as describing the whole genus put forward as the one applicable to the case, but only some particular species thereof, the rule has no application.' "

Western Auto Transportation v. City of Cheyenne, 57 Wyo. 351, 118 Pac. (2d) 761. We are not inclined to think, all these matters considered, that the law mak-

ing body of this state had in mind when it enacted the law of 1877, now W. R. S., § 57-424, that the insurance business should be transacted by any such organization as the plaintiff Exchange presents, or that a "future development" of this character was intended to be included by the use of the word "association".

The only association of any consequence engaged in the insurance business at the time the law of 1877 was enacted would seem to be the type of association known as "Lloyds Insurance". But reciprocal insurance is not "Lloyds" as Mr. Couch in his able note in 94 A. L. R. 836, 837, 838 has indicated thus:

"While the reciprocal system of insurance resembles both Lloyds and mutual insurance, it differs materially from both. For instance, in Lloyds all the underwriting members are insurers, but all are not insured, whereas in reciprocal insurance all the members are both insurers and insured. Under the latter system there is only a separate and several liability, whereas the liability of members of mutual companies is joint and several. Again, mutual companies often are incorporated, whereas reciprocal associations or exchanges have no corporate existence, although the attorney as such often does become incorporated."

In Ralli v. White, 47 N. Y. S. 197, 21 Misc. 285, the court describes Lloyds Insurance in the following language:

"In the primitive days of insurance * * * the underwriters met at Lloyd's Coffee House on Lombard street, London, and passed around the proposed policy of the applicant among the members, so that each could underwrite and subscribe his name for such portion of the required amount as he wished to undertake, until by successive subscriptions the entire amount was covered. * * * It was sufficient to call the contract a Lloyd's policy, because made at Lloyd's. But since these associations of underwriters are now numerous bodies, each independent of the other, some distinctive name and place of meeting are necessary to determine one enterprise from another and prevent confusion. * * *

The modern methods of these associations merit notice. Instead of passing the proposed policy of the applicant among the members, that each may underwrite for such portion of the required amount as he wishes to become liable for, according to the early practice at Lloyd's, the underwriters * * * organized for business by executing a formal instrument, declaring their purpose and authorizing attorneys in fact to issue policies in their name, binding each underwriter severally to an equal amount."

It may not be argued with force that inasmuch as the language of the law (§ 57-424, supra) was amended several times in the past (the last amendment being made in the 1931 legislature where the paid-up capital requirement was altered from the sum of $100,000 to $200,000) the entire law should be regarded and interpreted under the conditions in the field of insurance prevailing at that time.

For, as said by 59 C. J. 1097, ordinarily the rule is:

"Where an amendment leaves certain portions of the original act unchanged, such portions are continued in force, with the same meaning and effect they had before the amendment. So where an amendatory act provides that an existing statute shall be amended to read as recited in the amendatory act, such portions of the existing law as are retained, either literally or substantially, are regarded as a continuation of the existing law, and not as a new enactment."

In accord, the Supreme Court of Missouri in State ex rel. Buerk v. Calhoun, 330 Mo. 1172, 52 S. W. (2d) 742, 83 A. L. R. 1393, has said:

"And the presumption is that the Legislature in enacting the new statute used the word in the same sense as it was used in the old statute, nothing to the contrary appearing. Kelley v. Thuey, 143 Mo. 422, 45 S. W. 300."

But if we should be mistaken in these views, a scrutiny of § 57-424 alone would seem to lead us to the

same conclusion so far as the ultimate result of this litigation is concerned. As already noted, that section declares that no insurance company, association, or partnership either domestic or foreign shall transact any insurance business in this state "unless possessed of not less than Two Hundred Thousand dollars ($200,000.00) of actual paid-up capital *exclusive of any assets of any such company as shall be deposited in any other states or territories or foreign countries for the special benefit of security of the insured therein.*" (Italics supplied.) It should be observed in this connection that the word "of" before the word "security" in said section 57-424 is evidently a typographical error and should read as it was originally enacted in 1877 and as it appears in the Montana law presently to be mentioned, "or".

Recalling the testimony of the Vice-President and general counsel of the Attorney that 80 per cent of the policy premiums of each subscriber passes into the funds of the Exchange and is to be available, as we have seen that the California law declares, for the payment of "any liability of the Exchange" i. e. losses, certain expenses, etc.—in other words for the "special benefit of (or) security of the insured therein"—it would appear that the Exchange does not have the necessary capital as contemplated by the section last above mentioned.

It cannot be contended reasonably, as we see it, that the resolution of the subscribers to the Exchange under date of March 25, 1940, quoted above, removes this difficulty for that resolution while declaring that $200,000.00 is "irrevocably" pledged as paid-up capital, it is "for the payment of any and all liabilities now or hereafter to be incurred by or in the name of the Exchange." In short, it is to be used just as all the other 80 per cent of each premium deposited by each subscriber is required to be used. There appears to be no

authority to be found in the California law authorizing such a pledge. Indeed, the California law is to the contrary so far as the irrevocable nature of the pledge is concerned and could not be overridden by any action or rules of the Exchange. That our interpretation of the meaning of the resolution is correct is also supported by the testimony of the Vice-President and general counsel of the Attorney for he said as a witness on behalf of the plaintiff, it will be remembered, that the $200,000.00 pledge aforesaid was "irrevocable until all liabilities" of the Exchange had been paid. "That means," said he, "it is available for the payment of all liabilities."

Again we find that the structure of the reciprocal insurance organizations under the law of California would appear to have been construed by the California courts contrary to the view urged upon us by the Exchange in the instant case. We refer to the decision of the California District Court of Appeals in the case of Mitchell v. Pacific Greyhound Lines, 33 Cal. App. (2d) 53, 91 Pac. (2d) 176. That was a case where Mitchell, the Insurance Commissioner of California, acting as the liquidator of California Highway Indemnity Exchange, brought an action against the defendant subscribers of said Exchange seeking a declaratory judgment declaring inter alia "the method to be employed in determining the liability of the subscribers." The court below found that the organization was insolvent with an excess of liabilities over assets estimated at approximately $800,000.00. The action was brought against certain defendant subscribers "on the theory of virtual representation of all of some 65,000 subscribers" and undertook to settle certain differences "common to all of the subscribers under the common form of contract and power of attorney of each sub-

scriber." In the course of the opinion filed in that case, the court said:

"*From what has been said, it is apparent that a reciprocal 'organization' differs in many respects from the ordinary stock or mutual insurance company. It has no stock and no capital as such.* Its operating fund consists of the premiums paid for its policies and the earnings on any investment of those premiums. The contingent liability of the subscribers, Sec. 2, to pay sums in addition to their premiums stands in the place of the capital of the stock company and the liability of the subscribers to meet such contingent liability may be likened in some respects to the liability to pay unpaid stock subscriptions to a stock company. The plan appears to be designed for those who desire to assume the position of both the insurer and insured with a view to eliminating that part of the ordinary insurance premium which goes into profit. As rates for automobile insurance are not fixed by law in this state but by the insurer, it is clear under the plan that the subscribers delegate this duty of fixing rates to the attorney and that the subscribers face the risk that the rates fixed by the attorney may be inadequate. If the rates so fixed are inadequate, it is clear that the plan contemplates that the contingent liability will arise. It will be noted that section 2 of the act gives the right to limit 'the contingent liability * * * for the payment of losses' but not for other expenses; * * *" (Italics ours.)

It is true that this decision was under the reciprocal insurance law of California of 1921, but so far as the matter in which we are now interested is involved viz., the interpretation of the word "capital", it would appear to be distinctly pertinent.

Our attention has been directed by the Exchange to the case of State ex rel. Intermountain Lloyds et al. v. Porter, State Auditor, 88 Mont. 347, 294 Pac. 363 and it is insisted that as the statute involved and construed in that case (§ 6149 Rev. Codes Mont. 1921) is similar in part to Section 57-424 W. R. S. 1931, the decision

should be persuasive here. We are unable to acquiesce in the view. This decision, it is true, held that the Intermountain Lloyds had "actual paid-up capital" within the meaning of § 6149 aforesaid but the Intermountain Lloyds organization was a Utah concern framed under the provisions of Ch. 85, Laws Utah of 1929. A mere cursory examination will establish that the provisions of this chapter are radically different from those in California which we have reviewed above. The Montana Court was called upon to construe the word "capital" in its broad meaning only. It may be noted also that this decision was before the Idaho court in the Diefendorf case, supra, and was distinguished as a decision in another jurisdiction "not dealing with like or similar statutes" in Idaho and so was of "little or no assistance." We think that the Montana decision will not aid us in the case at bar not only when viewed in the light of Sections 57-401 et seq. W. R. S. 1931 referred to above but when it appears that the court was not required to consider the effect of the language contained in Section 4952, supra, immediately following the words "paid-up capital" reading "exclusive of any assets of any such company as shall be deposited in any other states or territories or foreign countries for the special benefit or security of the insured therein."

Additionally, even if we were of the opinion that the Exchange was an "association" and had "capital" as contemplated by § 57-424 for the purpose of writing or carrying on an insurance business, we are far from clear that the Exchange has such a general scheme of operation or structure as against the discretionary conclusion of the Insurance Commissioner of Wyoming that he could not control its activities because no Wyoming law governs concerns of like character. We are inclined to agree with the reasoning of the Supreme Court of Ohio in the Conn case, supra, as exemplified

in the quotation made therefrom and to conclude that the Insurance Commissioner in this state is "invested with a measure of discretion in granting or withholding" authority to a concern desiring to transact an insurance business in Wyoming. This does not mean, of course, that such officer might arbitrarily deny that right in the face of plain provisions of law allowing a corporation such an entry on its part. His discretion is necessarily reviewable by the courts as provided by § 47-304 W. R. S. 1931. In this connection it may well be observed also that section 57-424 does not declare that if a company or organization has the paid-up capital that section requires that thereby it is entitled to do an insurance business in this state.

Finally as noted above the 1941 legislature of this state, being fully advised of the negative attitude of the Commissioner in the matter of the admission of this Exchange for the purpose of writing insurance policies in Wyoming, declined to enact Senate File No. 42 as described above. If that bill had become a law there could be little question of the right of the Exchange to engage in business here. Whether that proposed enactment sufficiently safeguarded the interests of the citizenship of this commonwealth in this character of business is quite another question and one with which we are not at this time concerned. But the bill, as a matter of fact, failed of passage and we think that while not conclusive nor even controlling in any degree in the determination of the questions at bar, it may not be overlooked in our examination of this cause.

We therefore reach the conclusion that before reciprocal insurance organizations like the plaintiff Exchange should be permitted to transact insurance and insurance business in this state, the legislature thereof should declare clearly upon what terms and under what restrictions, if any, such concerns shall be allowed to write policies of indemnity for the people of Wyo-

ming. The legislatures of other states have done this for their citizenship and no reason occurs to us why that should not be the case here. As a matter of fact before pressing this litigation it is apparent that the Exchange itself thought it wise to apply to the Wyoming legislature for specific authority in the form of a definite statute entitling said Exchange to come within our borders for transacting its business.

The declaratory judgment in the district court, as stated above, is accordingly reversed with directions to dismiss the plaintiffs' petition.

*Reversed.*

KIMBALL, Ch. J., and BLUME, J., concur.