[No. B089335. Second Dist., Div. Three. Oct. 31, 1996.]

WOO CHUL LEE et al., Plaintiffs and Appellants, v.
INTERINSURANCE EXCHANGE OF THE AUTOMOBILE CLUB OF
SOUTHERN CALIFORNIA et al., Defendants and Respondents.

696

## COUNSEL

Keith E. Hall, Arter & Hadden, Edwin W. Duncan, Richard N. Ellner, Richard L. Fruin and William S. Davis for Plaintiffs and Appellants.

Morrison & Foerster, Seth M. Hufstedler and John Sobieski for Defendants and Respondents.

Greines, Martin, Stein & Richland, Robert A. Olson, Barry M. Wolf, Pillsbury, Madison & Sutro, Robert M. Westberg and Joseph A. Hearst as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**CROSKEY, Acting P. J.**—Three years ago, in *Barnes* v. *State Farm Mut. Auto. Ins. Co.* (1993) 16 Cal.App.4th 365 [20 Cal.Rptr.2d 87] (hereafter, *Barnes*), this court considered, among other issues, the question of whether a policyholder of a mutual insurance company can object to, or seek judicial assistance to control, the insurer's maintenance, management and disbursement of surplus funds. We answered that question in the negative. (*Id.* at pp. 378-380.)

The present action, brought by subscribers and former subscribers of the Interinsurance Exchange of the Automobile Club of Southern California (hereafter, the Exchange), raises essentially the same question.[1] However, unlike the defendant mutual insurer in *Barnes*, the Exchange is a reciprocal

---

[1] Plaintiffs Woo Chul Lee and Rosemarie Flocken are current subscribers; plaintiff Jeung Sook Han, a subscriber for 10 years, withdrew in 1992. The lawsuit is designated in the complaint and in plaintiff-appellants' opening brief on appeal as a class action. However, it does not appear that a class has been certified.

insurer, organized under chapter 3 (§ 1280 et seq., "Reciprocal Insurers,") of division 1, part 2 of the Insurance Code.[2]

Reciprocal insurers, alternatively called interinsurance exchanges, differ from mutual insurers in some details of structure and legal status. However, as we shall explain, the differences between mutual and reciprocal insurers are not of a kind which justifies different rules respecting their insured's right to control business decisions of the insurer's governing board. We thus conclude that a reciprocal insurer, like a mutual insurer, is subject to the common law business judgment rule, which we relied upon in *Barnes*, and which protects the good faith business decisions of a business organization's directors, including decisions concerning the maintenance, management and disbursement of an insurer's surplus funds, from interference by the courts.

This action is against the Exchange; its board of governors and 11 of its members and former members (hereafter, collectively, the Board); the Automobile Club of Southern California (the Club); and ACSC Management Services, Inc. (ACSC). The plaintiffs appeal from a judgment of dismissal after the defendants' demurrer to the third amended complaint was sustained without leave to amend. We agree with the trial court's conclusion that plaintiffs failed to allege facts sufficient to constitute a cause of action against the defendants on any theory, because (1) the business judgment rule precludes judicial interference with the Board's good faith management of Exchange assets, (2) the plaintiffs have not alleged facts which establish a lack of good faith or a conflict of interest in the Board's management of Exchange assets, and (3) the plaintiffs, in executing subscriber's agreements with the Exchange, have contractually agreed to delegate control over Exchange assets to the Board, and such agreement is neither unconscionable nor unenforceable. We therefore affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Introduction*

The Exchange is a reciprocal insurer, organized by the Club to provide insurance to Club members. The Club is a nonprofit corporation. In addition to the Exchange, the Club also organized, and is the parent organization of,

---

[2]All statutory references are to the Insurance Code unless otherwise indicated.

codefendant ACSC. Section 1305 provides for a reciprocal insurer's insurance contracts to be executed by an attorney-in-fact, which may be a corporation. ACSC is the attorney-in-fact for the Exchange.[3]

ACSC derives its management authority from powers of attorney which are included in the subscriber's agreements executed by subscribers when they purchase insurance from the Exchange. The subscriber's agreements also (1) delegate to the Board the subscribers' rights of supervision over the attorney-in-fact; (2) provide that the subscriber agrees to be bound by the bylaws and rules and regulations adopted by the Board; (3) warrant that subscribers shall not be liable in excess of their premiums for any debts or liabilities of the Exchange; and (4) provide that dividends or credits may, by resolution of the Board, be returned to subscribers.

The plaintiffs' theories of recovery have shifted somewhat over the course of this litigation. However, the lawsuit's primary aim throughout the litigation has been to alter the Exchange's practice of maintaining large amounts of unallocated surplus. The plaintiffs claim, in effect, that it is inherent in the concept of interinsurance that subscribers have a greater ownership interest in the funds of an exchange and greater rights of control over the funds than are recognized by the operating rules and practices of the Exchange. They also claim it would be in the best interests of the Exchange and its subscribers if surplus funds were maintained, not as unallocated surplus, but in subscriber savings accounts, from which subscribers may withdraw their accumulated funds upon withdrawal from membership in the Exchange.

## 2. *The Historical and Current Nature of Reciprocal Insurance*

The first interinsurance exchanges were formed in the 1880's by groups of merchants and manufacturers. These exchanges were a form of organization by which individuals, partnerships or corporations, which were engaged in a similar line of business, undertook to indemnify each other against certain kinds of losses by means of a mutual exchange of insurance contracts, usually through the medium of a common attorney-in-fact, who was appointed for that purpose by each of the underwriters, or "subscribers." (Reinmuth, The Regulation Of Reciprocal Insurance Exchanges (1967) ch. I, The Development and Classification of Reciprocal Exchanges, pp. 1-2 (hereafter, Reinmuth); see also *Delos* v. *Farmers Insurance Group* (1979) 93

---

[3]Section 1305 provides that the contracts of insurance that are exchanged by subscribers of a reciprocal insurer "may be executed by an attorney-in-fact, agent or other representative duly authorized and acting for such subscribers under powers of attorney. Such authorized person is termed the attorney, and may be a corporation."

Cal.App.3d 642, 652 [155 Cal.Rptr. 843].) In the early 20th century, the concept of reciprocal insurance spread to consumer lines. The Exchange, organized by the Club in 1912, was the first reciprocal to offer automobile insurance. (Reinmuth, *supra*, ch. I, p. 3.)

Under the historical form of interinsurance contracts, each subscriber became both an insured and an insurer, and had several, not joint, liability on all obligations of the exchange. (*Delos* v. *Farmers Insurance Group, Inc., supra*, 93 Cal.App.3d at p. 652; 2 Couch on Insurance 2d (rev. ed. 1984) § 18.11, p. 613) (hereafter, Couch); Reinmuth, *supra*, ch. II, The Legal Status Of Reciprocal Exchanges, pp. 10-20.) Accordingly, reciprocal insurers originally had no stock and no capital. The subscribers' contingent liability stood in place of capital stock. (*Mitchell* v. *Pacific Greyhound Lines* (1939) 33 Cal.App.2d 53, 59-60 [91 P.2d 176]; Couch, *supra*, § 18.11, pp. 614-615; Reinmuth, *supra*, ch. I, p. 2.) Originally, funds for the payment of losses and other debts were collected from subscribers as they occurred. However, this system resulted in frequent delays, hence subscribers later agreed to pay annual "premium deposits." (Reinmuth, *supra*, ch. I, p. 2.) These deposits remained to the credit of each subscriber in a separate account. (*Ibid.*; see also *Cal. State Auto. etc. Bureau* v. *Downey* (1950) 96 Cal.App.2d 876, 879-880 [216 P.2d 882].) Subscribers' pro rata shares of losses and expenses, including a commission to the attorney-in-fact, were deducted as they occurred. Any balance remaining in a subscriber's account at the end of the year reverted to the subscriber as his or her "savings" or "surplus" and was distributed to the subscriber or was available to the subscriber upon withdrawal from the exchange. (Reinmuth, *supra*, ch. I, p. 2, ch. II, pp. 30-31.) On the other hand, if the subscriber's share of losses and expenses was greater than his deposit, the subscriber could be assessed for a specified maximum amount beyond the deposit. (Couch, *supra*, §§ 18:26-18:30, pp. 633-641; Reinmuth, *supra*, ch. I, p. 2.) By approximately the 1960's, this amount, in a number of states, came to be specified by statute and was commonly limited to an amount equal to one additional premium deposit. (Reinmuth, *supra*, ch. II, pp. 17-19; see, e.g., §§ 1397, 1398.)

The original concept of reciprocal insurance contemplated the allocation of all surplus to the individual subscribers. (Reinmuth, *supra*, ch. II, pp. 30-31.) Over time, however, it became customary for reciprocals to accumulate unallocated surplus, which was not subject to withdrawal by departing subscribers, but was held perpetually in anticipation of catastrophic losses. (Reinmuth, *supra*, ch. II, pp. 32-37; ch. X, Conclusions and Policy Alternatives, pp. 186-187.) By maintaining substantial surpluses of this kind, many reciprocals eventually obtained statutory rights to issue nonassessable poli-

cies, under which subscribers had no contingent liability for claims, expenses or losses of the exchange. The practice of issuing nonassessable policies is now common both in California and elsewhere. (Reinmuth, *supra*, ch. II, p. 18.) This, together with other lesser differences between today's reciprocals and those of the past, has led one commentator to conclude that the only remaining substantive difference between a reciprocal exchange and a mutual company is that some exchanges are managed by corporate proprietary attorneys-in-fact. (Reinmuth, *supra*, ch. II, p. 39.)

The reciprocal form of insurance organization as it now exists in California has been characterized by both parties to this action as difficult to define. However, the trial court gave an apt definition of this kind of enterprise: "This is what it is: it's an interinsurance exchange defined by the Insurance Code." As defined by the Code, a California reciprocal insurer retains little similarity to the reciprocals of the 19th century. The defining statutory characteristics of an interinsurance exchange which are relevant to the present controversy are as follows.

First, section 1303 now provides that reciprocals are no longer truly reciprocal enterprises, i.e., it is no longer true that each subscriber is both an insurer and an insured. Rather, section 1303 provides that a reciprocal insurance company, or interinsurance exchange, "shall be deemed the insurer while each subscriber shall be deemed an insured."

As in historical times, a present-day interinsurance exchange is managed by an attorney-in-fact, who is appointed pursuant to powers-of-attorney executed by the exchange's subscribers. (§ 1305.) The attorney-in-fact may be a corporation (*ibid.*); the code does not require an exchange's attorney-in-fact to be a nonprofit corporation. An exchange's power of attorney and contracts may provide for the exercise of the subscribers' rights by a board. (§ 1307, subd. (d).) The board must be selected under rules adopted by the subscribers and is required to supervise the exchange's finances and operations to assure conformity with the subscriber's agreement and power of attorney. (§ 1308.) The board must be composed of subscribers or agents of subscribers; not more than one-third of the board members may be agents, employees or shareholders of the attorney-in-fact. (§ 1310.)

In accord with the modern trend toward accumulating unallocated reserves rather than distributing surplus to the subscribers, the directors of a modern

California exchange may, but are not required to, return savings or credits to the subscribers. (§ 1420.) However, such distributions are permissible only if there is no impairment of the assets required to be maintained by sections 1370 and following. (*Ibid.*)[4]

In accord with the modern trend away from subscriber liability for a reciprocal's debts, section 1401 provides that, if an exchange maintains surpluses that are sufficiently beyond the legal minimum, it may obtain a certificate from the Insurance Commissioner authorizing the issuance of nonassessable policies. While such a certificate is in effect, subscribers have no contingent liability for claims, expenses or losses of the exchange. Under section 1401.5, an exchange which maintains surpluses of more than $3 million for five successive years may obtain a certificate of perpetual nonassessability.[5]

If an exchange issues assessable policies, each subscriber is liable, beyond his or her annual premium, for assessments levied by the attorney-in-fact or the commissioner to satisfy claims against the exchange which exceed the exchange's surplus. (§§ 1391, 1392, 1398.) An exchange's power of attorney may limit the amount of assessments (§ 1397), but each subscriber's contingent liability must be at least equal to one additional premium (§ 1398). The personal liability of subscribers can be asserted by the attorney-in-fact or the commissioner. (§ 1391.) However, if a debtor of the exchange obtains a judgment against the exchange, and it remains unsatisfied for 30 days, such debtor may proceed directly against the subscribers for any amount for which each subscriber could be assessed by the attorney-in-fact or the commissioner. (§§ 1450, 1451.) An individual subscriber can avoid liability for assessments, even if the exchange issues assessable policies, if the subscriber, in addition to his or her annual premium, maintains a surplus deposit in an amount equal to the annual premium. (§§ 1399, 1400.)

---

[4]Section 1370 provides for the forms of investment in which a reciprocal's surplus must be maintained. Section 1370.2 requires most reciprocal insurers to maintain minimum surplus governed by the same standards for minimum paid-in capital and surplus applicable to capital stock insurers. Section 1370.4 provides that reciprocal insurers established before October 1, 1961, were initially exempt from section 1370.2 and establishes a schedule of the dates after which such reciprocals became progressively subject to section 1370.2. Under the schedule in section 1370.4, all reciprocals were fully subject to section 1370.2 by 1976.

The minimum surplus requirements do not apply to all exchanges. An exchange formed by a local hospital district and its staff physicians under section 32000 et seq., of the Health and Safety Code is not subject to the above requirements if it meets alternative requirements. (§ 1284.)

[5]The Exchange obtained such a perpetual certificate in 1987.

### 3. *Procedural History of This Action*

This action began as a challenge to the composition of the Board, which the plaintiffs claimed was in violation of section 1310.[6] On August 5, 1992, plaintiffs' attorney wrote a letter to the defendants' attorney, in which counsel said he had recently discovered that the Exchange was being operated in violation of section 1310, in that, of eight Board members listed in the letter, all were also directors or officers of the Club, and three were also directors or officers of ACSC. Counsel demanded that the entire Board resign and that control of the Exchange be vested in the subscribers. Counsel also expressed the view, among others, that the Exchange's policyholders should be the ones to determine the amount of surplus retained by the Exchange, and that the amount then retained appeared excessive. Counsel threatened a lawsuit if an agreement concerning the matters raised by his letter were not reached by August 14..

On August 21, 1992, the plaintiffs filed their original complaint. The defendants generally demurred, and on October 30, before the date set for the hearing on the demurrer, the plaintiffs filed a first amended complaint, in which they alleged that more than one-third of the Board members were agents, employees or shareholders of the attorney-in-fact, ACSC, in violation of section 1310. The plaintiffs also alleged that the Board's unlawful composition violated Business and Professions Code section 17200.[7] Plaintiffs prayed that the defendants be enjoined from continuing to allow the Board to be so constituted. They further alleged that, because of the unlawful constitution of the Board, its actions were not protected by the business judgment rule, respecting directors' discretion over the management of a company's funds, and consequently, the subscribers were entitled to an accounting and distribution of improperly retained surplus.

A demurrer to the first amended complaint was sustained with leave to amend, and plaintiffs thereafter filed a second amended complaint, in which it was alleged that (1) the Board was not selected by subscribers, in what the plaintiffs now claimed was a violation of section 1308[8]; (2) the subscribers were unlawfully deprived of control over the conduct of the Exchange; (3)

---

[6]Section 1310 provides that: "Such body shall be composed of subscribers or agents of subscribers. Not more than one-third of the members serving on such body shall be agents, employees or shareholders of the attorney."

[7]Business and Professions Code section 17200 provides that any "unlawful," "unfair," or "fraudulent" business act or practice is deemed to be unfair competition. Business and Professions Code section 17203 authorizes injunctive relief to prevent such conduct and/or restitution of money or property wrongfully obtained "by means of such unfair competition."

[8]Section 1308 provides that: "The body exercising the subscribers' rights shall be selected under such rules as the subscribers adopt. It shall supervise the finances of the exchange and

the subscriber's agreement was a contract of adhesion; (4) the Board was a fiduciary of the subscribers; and (5) the Board had breached its fiduciary duties by failing to provide insurance at cost and by mismanaging and misappropriating surplus funds which rightfully belonged to the subscribers. The second amended complaint prayed for declaratory and injunctive relief, an accounting, a constructive trust over improperly held surplus and compensatory and punitive damages.

After the filing of a demurrer to the second amended complaint, the action was referred to the Commissioner of Insurance pursuant to the "primary jurisdiction doctrine." (*Farmers Insurance Exchange* v. *Superior Court* (1992) 2 Cal.4th 377, 386-392 [6 Cal.Rptr.2d 487, 826 P.2d 730].) However, the commissioner refused to assume jurisdiction and also declined a request by the plaintiffs to intervene.[9] The trial court then sustained the defendants' demurrer to the second amended complaint with leave to amend and issued a detailed explanation of its ruling.

The court held, as a general matter, that the common law business judgment rule applies to the directors of a reciprocal insurer and precludes the courts from interfering with the management of such an insurer's surplus funds. The court further held that the plaintiffs: (1) did not allege that the delegation of authority and waiver of the right of control over the Exchange, which is included in the subscriber's agreement, is contrary to section 1308; (2) did not allege sufficient facts to render the subscriber's agreement unenforceable under the doctrine of unconscionability set out in *Dean Witter Reynolds, Inc.* v. *Superior Court* (1989) 211 Cal.App.3d 758 [259 Cal.Rptr. 789]; (3) cited no legal authority for their claim that a reciprocal insurer must provide insurance at cost; (4) did not plead facts showing that the Exchange maintained more than a reasonably necessary level of surplus; (5) did not allege facts which establish an exception to the business judgment rule; (6) cited no authority for their claim that, upon expiration of their policies, they have a legal right to repayment of sums paid by them and

shall supervise its operations to such extent as to assure conformity with the subscriber's agreement and power of attorney."

[9]In an apparent effort to provide guidance to both the trial court and the parties, the commissioner did express the following comments: (1) The Exchange has no duty to limit its surplus funds to the statutory minimum surplus amount; (2) the Exchange has no duty to pay dividends; (3) Exchange subscribers do have ownership rights in surplus funds; (4) the Exchange has no duty to provide insurance coverage "at cost," but has a duty to exercise sound accounting principles in managing surplus; (5) the manner in which the Board is selected appears to violate section 1308 (see fn. 10, *post*); (6) the plaintiffs' challenge to the structure of the Board reflects inadequacies in the statutes governing reciprocals, which, in the commissioner's view, do not provide for sufficient accountability of reciprocal governing boards to subscribers; and (7) the question of how surplus funds of the Exchange should be disposed of upon any dissolution of the Exchange is not ripe for decision.

placed in surplus; (7) failed to state a presently cognizable claim of entitlement to a distribution of surplus upon dissolution of the Exchange; and (8) did not state facts sufficient to give the defendants notice of claimed misconduct by ACSC, for which expenses were allegedly incurred and then allegedly defrayed with funds properly belonging to the subscribers.

The plaintiffs' third amended complaint, the one before us, is substantially similar to the second. However, the plaintiffs have deleted their previous allegations that ACSC has committed misconduct for which the Exchange has incurred expenses and that the Board is illegally constituted.[10] The third amended complaint adds to the plaintiffs' previous allegations the further claims that: (1) an interinsurance exchange is similar to a joint venture, in which the general partners have fiduciary duties to the limited partners; and (2) the defendants have engaged in unlawful and fraudulent business practices, as defined in Business and Professions Code section 17200 by: (a) mismanaging Exchange funds; (b) failing to inform potential subscribers of all provisions of the Exchange's bylaws and rules and regulations; and (c) affirmatively representing in the subscriber's agreement that subscribers are not personally liable on judgments against the Exchange, a representation that plaintiffs claim is false.

The defendants again demurred, and this time the trial court sustained the demurrer without leave to amend. The trial court ruled essentially as it did on the previous demurrer, with additional findings that (1) there is no basis for the claim that an interinsurance exchange is a kind of joint venture, although an exchange's board and attorney-in-fact do have fiduciary duties to the subscribers; (2) subscribers of the Exchange are not liable beyond their premium deposits for judgments against the Exchange; and (3) neither the Exchange's failure to fully spell out its rules in the subscriber's agreement nor the rules themselves are unconscionable.

A judgment of dismissal was then entered, and the plaintiffs filed this timely appeal.

## CONTENTIONS

The plaintiffs challenge the practices of the Exchange, the Board and ACSC in managing surplus funds of the Exchange; they challenge the

---

[10]For reasons not appearing in the record, the plaintiffs deleted the latter allegation despite the fact that the commissioner, in his letter to the trial court declining jurisdiction over the case, expressed the view that the manner of selecting the Exchange's Board appeared to violate section 1308. (See fns. 8 & 9, *ante.*) Inasmuch as the plaintiffs have apparently abandoned their claims respecting the selection and composition of the Board, and the trial court therefore did not take such claim into account, we shall give no further consideration to this issue.

practices of the Club in marketing subscriptions to the Exchange. They contend that (1) the Exchange, the Board and ACSC mismanage Exchange funds by maintaining funds as unallocated surplus, rather than in subscriber savings accounts; (2) the Club misinformed them, when they became subscribers, as to the structure and rules of the Exchange, and consequently the plaintiffs are not bound by the subscriber's agreement, by which they delegated to the Board the authority to manage Exchange assets; (3) the defendants' mismanagement of Exchange assets and misrepresentations when marketing Exchange subscriptions constitute unlawful and fraudulent business practices under Business and Professions Code section 17200.

The plaintiffs further contend the Exchange should be compelled to (1) maintain surplus funds in subscriber savings accounts, and (2) expunge from its rules and regulations certain rules which limit subscribers' rights respecting surplus funds. They contend the Club should be compelled to disclose all material facts about the Exchange to future subscribers and make restitution to the Exchange's present and former subscribers of funds that were unlawfully and fraudulently obtained. Finally, plaintiffs claim the trial court abused its discretion in denying leave to amend the complaint.

DISCUSSION

### 1. Standard of Review

As this matter comes to us on a judgment of dismissal following the trial court's order sustaining the defendants' demurrer without leave to amend, we assume the truth of all properly pleaded facts, but not contentions, deductions or conclusions of fact or law. (*Aubry* v. *Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967 [9 Cal.Rptr.2d 92, 831 P.2d 317].) Assuming the truth of the plaintiffs' factual allegations, we then independently determine whether they have alleged cognizable claims. (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) As we shall explain, they have not.

### 2. Issues Concerning the Ownership and Management of Surplus

#### a. Decisions as to the Manner of Maintaining Surplus Constitute Exercises of Business Judgment

Plaintiffs make a point of distinguishing their claim—that the Exchange has a duty to maintain a substantial surplus in subscriber savings accounts—from claims like that made in *Barnes, supra,* 16 Cal.App.4th 365 that a corporation or other organization has a duty to pay a dividend or

other distribution. In 1993, according to the plaintiffs, the Exchange had approximately $787 million in unallocated surplus funds, a surplus which is significantly greater than is required by law. The plaintiffs do not ask us to compel a distribution or otherwise dictate actions affecting the *level* of surplus. Instead, they ask us to make orders respecting the *form* in which surplus is held. Specifically, the plaintiffs pray for an order requiring the Exchange to deposit into subscriber savings accounts all surplus that exceeds the legally required amounts.

The plaintiffs argue that the use of subscriber savings accounts will bring about substantial savings in federal taxes for the Exchange, because, under section 832(f) of the Internal Revenue Code (26 U.S.C. § 832(f)), surplus funds deposited by a reciprocal insurer into such accounts is not taxable income to the insurer, and under section 172(a) and (b) of the Internal Revenue Code (26 U.S.C. § 172(a), (b)), up to three years of prior taxes can be recaptured by depositing into subscriber accounts funds which were previously maintained as general surplus. The plaintiffs also argue that the use of subscriber savings accounts will protect subscribers' legitimate interests in surplus funds. Finally, they argue that subscriber savings accounts are successfully used by other reciprocal insurers.

The defendants and amici curiae respond with several arguments tending to show that deposits of surplus into subscriber saving accounts would reduce the funds which the Exchange could rely upon in the event of catastrophic losses, and thus would not be advantageous to the Exchange or its subscribers. However, the defendants do not ask us to resolve the question of whether the use of subscriber savings accounts would be beneficial. To the contrary. The defendants and amici contend the resolution of that question depends upon how one weighs the potential tax advantages of subscriber savings accounts against the risks entailed if large amounts of surplus are held in a form which can be withdrawn by subscribers. The defendants contend, and the trial court so held, that such a weighing of benefits against costs and risks is a prototypical application of business judgment. The defendants thus argue, and the trial court also so held, that, as is the case with other forms of business organization, courts may not interfere with such decisions of a reciprocal insurer if the decision made by the directors can be attributed to a rational business purpose. The defendants rely primarily on our decision in *Barnes*, *supra*, 16 Cal.App.4th 365 for this proposition.

We can hardly disagree with the proposition that decisions as to strategies for managing the surplus funds of an insurer are quintessential exercises of business judgment. Likewise, there can be no doubt that the courts are

unqualified to second-guess the determinations made by an insurer, based upon actuarial analysis, as to the amount of funds that are reasonably necessary to assure adequate funds to cover catastrophic losses, or as to the optimal form in which the funds should be held. (*Barnes, supra,* 16 Cal.App.4th at p. 378; *Gaillard* v. *Natomas Co.* (1989) 208 Cal.App.3d 1250, 1263 [256 Cal.Rptr. 702].) Finally, assuring the availability of adequate funds to cover losses is plainly a rational business purpose for an insurer. Thus, if the business judgment rule applies to reciprocal insurers, it would preclude plaintiffs' efforts to dictate the form in which the Exchange maintains its surplus. (*Barnes, supra,* 16 Cal.App.4th at p. 378.)

 The business judgment rule is " 'a judicial policy of deference to the business judgment of corporate directors in the exercise of their broad discretion in making corporate decisions.' " (*Barnes, supra,* 16 Cal.App.4th at p. 378; *Gaillard* v. *Natomas Co., supra,* 208 Cal.App.3d at p. 1263.) The rule is based on the premise that those to whom the management of a business organization has been entrusted, and not the courts, are best able to judge whether a particular act or transaction is helpful to the conduct of the organization's affairs or expedient for the attainment of its purposes. (*Barnes, supra,* 16 Cal.App.4th at p. 378; *Eldridge* v. *Tymshare, Inc.* (1986) 186 Cal.App.3d 767, 776 [230 Cal.Rptr. 815].) The rule establishes a presumption that directors' decisions are based on sound business judgment, and it prohibits courts from interfering in business decisions made by the directors in good faith and in the absence of a conflict of interest. (*Katz* v. *Chevron Corp.* (1994) 22 Cal.App.4th 1352, 1366 [27 Cal.Rptr.2d 681]; *Barnes, supra,* 16 Cal.App.4th at pp. 379-380.)

 In *Barnes,* we concluded that the rule applies to mutual insurance companies and that it precluded Barnes's effort to compel the defendant insurance company to pay a dividend. (16 Cal.App.4th at p. 378.) We now must consider whether the rule applies to reciprocals.

### b. *The Governing Board of a Reciprocal Insurer Is Entitled to the Protection of the Business Judgment Rule*

The trial court in this case recognized that the business judgment rule is most commonly applied to corporations, but nevertheless held that "practical experience and common sense suggest that the rule is appropriately extended to members of the Board of Governors of the Exchange." We agree.

The plaintiffs contend that, for two reasons, the business judgment rule does not and should not apply to an interinsurance exchange. First, they contend there are significant differences between reciprocal insurers on the

one hand and corporate and mutual insurers on the other, which make it inappropriate to apply the business judgment rule to reciprocals. In particular, the plaintiffs argue that, unlike the policyholders of a mutual insurer, subscribers to a reciprocal insurer execute subscriber's agreements and powers-of-attorney, which create contractual and fiduciary duties that are not subject to the business judgment rule. Secondly, they argue that section 1282, subdivision (a)(7) and (a)(20), preclude application to reciprocal insurers of the statutes governing corporations and mutual insurers, including the statutory business judgment rule stated in Corporations Code section 309.

The contention that the business judgment rule should not apply to reciprocal insurers because the boards and attorneys-in-fact of reciprocals are the agents of the subscribers and have fiduciary duties to them is without a legal basis. The existence of a fiduciary relationship between the board and the participants in an enterprise has never precluded application of the rule. For example, the courts have applied the business judgment rule to limited partnerships, although general partners are held to be agents and fiduciaries of the limited partners. (*Wallner* v. *Parry Professional Bldg., Ltd.* (1994) 22 Cal.App.4th 1446, 1453-1454 [27 Cal.Rptr.2d 834]; *Wyler* v. *Feuer* (1978) 85 Cal.App.3d 392, 402 [149 Cal.Rptr. 626].) Similarly, the directors and controlling shareholders of for-profit corporations and the directors of nonprofit corporations and mutual insurance companies are deemed to be agents and fiduciaries of the shareholders and members (*Jones* v. *H.F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 114-115 [81 Cal.Rptr. 592, 460 P.2d 464]; *Frances T.* v. *Village Green Owners Assn.* (1986) 42 Cal.3d 490, 505, 507 [229 Cal.Rptr. 456, 723 P.2d 573, 59 A.L.R.4th 447]; *Tenzer* v. *Superscope, Inc.* (1985) 39 Cal.3d 18, 31 [216 Cal.Rptr. 130, 702 P.2d 212]; *Barnes, supra,* 16 Cal.App.4th at p. 375), yet their management decisions are shielded by the business judgment rule. (*Frances T.* v. *Village Green Owners Assn., supra,* 42 Cal.3d at pp. 507-509; *Katz* v. *Chevron Corp., supra,* 22 Cal.App.4th at p. 1366; *Barnes, supra,* 16 Cal.App.4th at p. 379.)

Courts which have considered the relationship between a reciprocal insurer's board, its attorney-in-fact and its subscribers have concluded the relationship is analogous to the relationship between the directors, management and participants in other kinds of organizations. For example, at least one court has held that "[t]he position of the attorney-in-fact of a reciprocal insurance exchange, who manages the business of the exchange under powers of attorney of the subscribers . . . is fiduciary in character *to the same extent as that of the management of an incorporated mutual insurance company . . . .*" (*Industrial Indem. Co.* v. *Golden State Co.* (1953) 117 Cal.App.2d 519, 533 [256 P.2d 677], italics added.) Another court has

observed that a reciprocal insurer's "basic differences from [a mutual insurance company] are in mechanics of operation and in legal theory, rather than in substance." (*Cal. State Auto. etc. Bureau* v. *Downey* (1950) 96 Cal.App.2d 876, 880 [216 P.2d 882].)

If we look to the substance of the matter, it is clear that the relationship between the directors of a reciprocal insurer and its subscribers is identical in all significant ways to the relationship between the directors of any business organization and the organization's investors or other nonmanaging participants—*the directors are entrusted with the governance and management of the organization's affairs*. This being the case, the directors of a reciprocal exchange should be entitled to the protection of the business judgment rule to the same extent as the directors of other concerns. For reasons which have been fully discussed in numerous judicial authorities, California courts have consistently refused to interfere with directors' exercise of business judgment in making business decisions. (See, e.g., *Mutual Life Insurance* v. *City of Los Angeles* (1990) 50 Cal.3d 402, 417 [267 Cal.Rptr. 589, 787 P.2d 996] [declining to constrain insurers' business judgment as to how to maximize return on investment]; *Barnes, supra,* 16 Cal.App.4th at p. 378 [declining to interfere with insurer's business judgment as to level of surplus]; *Beehan* v. *Lido Isle Community Assn.* (1977) 70 Cal.App.3d 858, 865-867 [137 Cal.Rptr. 528] [refusing to compel homeowners association to pay attorney fees incurred by member in enforcing "CC & R's"]; *Findley* v. *Garrett* (1952) 109 Cal.App.2d 166, 174-175 [240 P.2d 421] [refusing to overturn directors' decision not to commence a lawsuit].)

Where the reason is the same, the rule should be the same. (Civ. Code, § 3511.) The boards of reciprocal insurers, based upon recommendations by the attorneys-in-fact, must make substantive financial decisions, such as setting and investing premiums and arriving at appropriate surplus levels, which are no different from those required of corporate and mutual insurers, and courts are no better qualified to second-guess the directors of reciprocal insurers than we are to second-guess the directors of other organizations as to similar decisions. Thus, for the same reasons that apply to other organizations, the courts may not interfere with the reasonable business decisions of reciprocal insurers. We therefore fully agree with the trial court's conclusion that practical experience and common sense require application of the business judgment rule to reciprocal insurers.

For the same reasons, we also reject the plaintiffs' claims that the defendants' management of Exchange funds constitutes an unlawful business practice. (Bus. & Prof. Code, § 17200.) Obviously, actions which are reasonable

exercises of business judgment, are not forbidden by law, and fall within the discretion of the directors of a business under the business judgment rule cannot constitute unlawful business practices. (Cf. *Farmers' Ins. Exchange* v. *Superior Court, supra*, 2 Cal.4th at pp. 383-384.)

### c. *Section 1282 Does Not Affect the Common Law Business Judgment Rule*

■ The plaintiffs claim section 1282 precludes application of the business judgment rule to reciprocal insurers. We disagree. The most that can be said for plaintiffs' argument is that it suggests reciprocal insurers are not subject to the *statutory* business judgment rule. (Corp. Code, § 309.) Section 1282 provides that certain provisions of the Insurance Code do not apply to reciprocal insurers. Among these are section 1140 and all of chapter 4 of part I, division 2, which relates to general mutual insurers. (§ 1282, subd. (a)(7) & (a)(20).) Section 1140 provides that incorporated insurers are subject to general corporation law; the statutes in chapter 4 of part I of division 2 set forth the special characteristics of mutual insurance plans. While section 1282 would seem to preclude application of Corporations Code section 309 to reciprocal insurers, it by no means precludes application of the common law business judgment rule.

The common law business judgment rule has two components—one which immunizes directors from personal liability if they act in accordance with its requirements, and another which insulates from court intervention those management decisions which are made by directors in good faith in what the directors believe is the organization's best interest. (2 Marsh & Finkle, Marsh's Cal. Corporation Law (3d ed., 1996 supp.) § 11.3, pp. 796-797.) Only the first component is embodied in Corporations Code section 309. Thus, even if Insurance Code section 1282 makes Corporations Code section 309 inapplicable to reciprocals, the second component of the common law rule is unaffected. It was, of course, the second component of the rule which we applied to mutual insurers in *Barnes, supra*, 16 Cal.App.4th 365, 378-379, and which we here apply to reciprocals.

### d. *The Plaintiffs Have Not Alleged Facts Which Establish an Exception to the Business Judgment Rule*

■ The plaintiffs contend that even if the business judgment rule applies to reciprocal insurers, they have alleged facts constituting exceptions to the rule. Specifically, they allege that (1) the Exchange and the Board did not make a reasonable inquiry concerning the advisability of maintaining surplus in subscriber savings accounts, and (2) in managing surplus funds,

the Exchange has acted for improper motives and as a result of a conflict of interest. It is, of course, true that the business judgment rule does not shield actions taken without reasonable inquiry, with improper motives, or as a result of a conflict of interest. (*Gaillard* v. *Natomas Co., supra,* 208 Cal.App.3d at pp. 1263-1264; *Eldridge* v. *Tymshare, Inc., supra,* 186 Cal.App.3d at pp. 776-777.) However, the plaintiffs have not alleged sufficient facts to establish such exceptions in this case. More is needed to establish an exception to the rule than conclusory allegations of improper motives and conflict of interest. Neither is it sufficient to generally allege the failure to conduct an active investigation, in the absence of (1) allegations of facts which would reasonably call for such an investigation, or (2) allegations of facts which would have been discovered by a reasonable investigation and would have been material to the questioned exercise of business judgment.

■ The business judgment rule sets up a *presumption* that directors' decisions are made in good faith and are based upon sound and informed business judgment. (*Barnes, supra,* 16 Cal.App.4th at p. 378; *Katz* v. *Chevron Corp., supra,* 22 Cal.App.4th at pp. 1366-1367.) An exception to this presumption exists in circumstances which inherently raise an inference of conflict of interest. (*Id.* at p. 1367.) Such circumstances include those in which directors, particularly inside directors, take defensive action against a take-over by another entity, which may be advantageous to the corporation, but threatening to existing corporate officers. (*Ibid.*) Similarly, a conflict of interest is inferrable where the directors of a corporation which is being taken over approve generous termination agreements—"golden parachutes"—for existing inside directors. (*Gaillard* v. *Natomas Co., supra,* 208 Cal.App.3d at pp. 1268-1271.) In situations of this kind, directors may reasonably be allocated the burden of showing good faith and reasonable investigation. (*Katz* v. *Chevron Corp., supra,* 22 Cal.App.4th at p. 1367; cf. *Gaillard* v. *Natomas Co., supra,* 208 Cal.App.3d at p. 1271 [under circumstances raising an inference that corporate interests were not served, trier of fact could find that directors should have independently reviewed the terms of challenged "golden parachutes"].) But in most cases, the presumption created by the business judgment rule can be rebutted only by affirmative allegations of facts which, if proven, would establish fraud, bad faith, overreaching or an unreasonable failure to investigate material facts. (*Eldridge* v. *Tymshare, Inc., supra,* 186 Cal.App.3d at p. 776-777.) Interference with the discretion of directors is not warranted in doubtful cases. (*Beehan* v. *Lido Isle Community Assn., supra,* 70 Cal.App.3d 858, 865.)

■ The plaintiffs do not claim that the defendants failed to ascertain that federal tax savings could result from depositing surplus funds in subscriber savings accounts. The true thrust of their argument is that the

defendants have refused to avail the Exchange of such savings. In effect, the argument is that the defendants' inquiry into the use of subscriber saving accounts was not a reasonable inquiry because the defendants reached a conclusion with which the plaintiffs disagree. However, it is the essence of the business judgment rule that the conclusions of an entity's directors concerning business strategy will not be scrutinized by the courts absent allegations of facts tending to show that the conclusions were based upon inadequate information or were made in bad faith.

The plaintiffs contend bad faith and overreaching are established by the facts that (1) the Club, the Exchange and ACSC have interlocking boards, (2) the Club appoints the Exchange's Board, and (3) the Exchange makes certain payments to the Club. Plaintiffs contend that, through the interlocking boards and the Club's power to appoint the Exchange's Board, the Club is able to exert undue influence on the Exchange's Board, resulting in the Exchange's (1) having a conflict of interest between the Club and its subscribers, (2) operating for the benefit of the Club and adverse to the interests of the subscribers, and (3) paying allegedly "secret profits" to the Club.

Plaintiffs claim that two categories of secret profits are paid to the Club: (1) current distributions to the Club and ACSC and (2) a contingent future interest retained by the Club in Exchange assets upon dissolution of the Exchange. The challenged current distributions consist of the following: (1) ACSC is compensated for its services to the Exchange at the actual cost of the services plus 1 percent of annual earned premiums; (2) ACSC, a wholly owned subsidiary of the Club, pays dividends to the Club; and (3) the Club receives directly from the Exchange 1 percent of the net annual premium deposits, a payment which the plaintiffs allege has exceeded $48 million since 1989.

The Club's contingent future interest in Exchange assets arises from rules 24 through 27 of the Exchange's rules and regulations. Rule 24 authorizes, but does not require, the Board to declare dividends and return savings to subscribers upon expiration of their policies; rule 25 declares that subscribers have no entitlement to a repayment of any sums upon expiration of their policies; rule 26 provides that, upon dissolution of the Exchange, all of its assets remaining after the repayment of debts are to become the property of the Club; rule 27 provides that rule 26 shall operate to the same effect and purpose as if each subscriber made an individual assignment to the Club of his or her interest in Exchange upon its dissolution. The plaintiffs claim the above rules effect a forfeiture of subscriber rights in Exchange assets.

The plaintiffs allege that the Exchange's decision to forfeit subscriber rights in favor of the Club is motivated by a desire to perpetuate the current

and future transfers of Exchange assets to the Club and ACSC, not by the defendants' avowed purpose of funding adequate reserves against contingencies. However, it is the very essence of the business judgment rule that, where a reasonable business purpose is asserted, the motives of directors will not be scrutinized, absent a basis for overcoming the presumption of good faith embodied by the business judgment rule. (*Katz* v. *Chevron Corp.*, *supra*, 22 Cal.App.4th at pp. 1366-1367.) Examples of such a basis include actions (1) which are inconsistent with the business purpose that is asserted (*Gaillard* v. *Natomas Co.*, *supra*, 208 Cal.App.3d at pp. 1269-1271 ["golden parachutes," which were challenged by the plaintiffs, encouraged officers of a taken-over corporation to leave the company, an effect inconsistent with the asserted corporate purpose of ensuring continuity of management]), (2) or which are so clearly against the interests of the affected organization that the challenged actions must have been the result of undue influence or a conflict of interest. (*Findley* v. *Garrett*, *supra*, 109 Cal.App.2d at p. 177.)

Here, the defendants assert they have determined it is prudent for the Exchange to maintain large unallocated surpluses in order to ensure that adequate funds will be available to cover the risks the Exchange insures. The plaintiffs have not alleged conduct which would establish that the defendants have acted for any other purpose. While the interlocking boards of the Club, the Exchange and ACSC may create an opportunity for the Club to exercise undue influence over the Exchange, that bare opportunity does not establish that fraud, bad faith or gross overreaching has actually occurred. Moreover, no facts are alleged which establish that the ongoing payments to ACSC of the actual costs of its services plus 1 percent of annual earned premiums, and to the Club of an additional 1 percent of annual earned premiums, are either inconsistent with the asserted goal of maintaining adequate reserves or so clearly against the interests of the Exchange and its subscribers that the payments must be the result of undue influence or a conflict of interest. The Club's contingent future interest in the surplus remaining upon dissolution of the Exchange is simply too remote and speculative to create a conflict of interest as to the disposition of present surplus in the absence of any showing or allegation the Exchange is at all likely to be dissolved within the foreseeable future.

In sum, the plaintiffs have not alleged facts which establish an exception to the business judgment rule. The trial court thus properly declined to interfere with the decisions of the Board respecting the management of surplus funds of the Exchange.

e. *Issues Respecting the Disposition of Accumulated Surplus Upon Dissolution of the Exchange Are Not Ripe for Decision*

■ Little discussion need be devoted to the plaintiffs' claim that the Exchange must be compelled to expunge from its rules and regulations rules

26 and 27, which assign to the Club a contingent future interest in Exchange assets in the event of its dissolution. As we have observed above, there has been no showing nor any allegation of a likelihood that the Exchange will be dissolved within the foreseeable future. Moreover, if the Exchange is dissolved, the disposition of its assets will necessarily be overseen by the commissioner. (§ 1070 et seq.) Persons claiming an interest in the assets will have the chance to challenge the Club's claims in the administrative proceedings. Under these circumstances, the trial court correctly held that the issue of whether the Club or the subscribers are entitled to Exchange assets upon dissolution is not now ripe for decision.

3. *Issues Concerning the Marketing of Subscriptions*

a. *Introduction*

■ The business judgment rule was not the sole basis for the court's determination not to interfere with the Exchange's management of its surplus. The court also observed that Exchange subscribers agreed in the subscriber's agreement to grant the Board discretion concerning the maintenance and use of surplus, and they are bound by that agreement.

The plaintiffs claim they are not bound by limitations in the subscriber's agreement upon their claimed rights respecting surplus funds, because they were fraudulently induced to enter into the agreement. The plaintiffs contend the subscriber's agreement affirmatively and falsely represents to potential subscribers that subscribers have no personal liability for losses and debts of the Exchange, although sections 1450, 1451 and 1453 provide that a judgment creditor of a reciprocal insurance company can proceed directly against the subscribers if the judgment remains unsatisfied after 30 days. They also contend the subscriber's agreement fails to disclose the material facts that (1) an exchange's subscribers have inherent rights in the exchange's assets; (2) the representative's manual, which is provided to sales personnel of the Club, states that the Exchange is "organized as a not-for-profit reciprocal insurer" and that premium deposits which are not used to assure the adequacy of reserves against contingencies "are returned to subscribers as policyholder's dividends"; and (3) the ownership and distribution rights which subscribers have under general law and the Club's internal operating rules are limited by the rules and regulations of the Exchange. They contend the subscriber's agreement is an insurance contract of adhesion, requiring that any limitations upon subscriber rights must be plain and conspicuous, or will be denied enforcement. They cite *Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 808 [180 Cal.Rptr. 628, 640 P.2d 764]; *Ponder* v. *Blue Cross of Southern California* (1983) 145 Cal.App.3d 709, 719 [193

Cal.Rptr. 632]; and *Westrick* v. *State Farm Ins.* (1982 ) 137 Cal.App.3d 685, 692 [187 Cal.Rptr. 214] for this proposition.

The plaintiffs also contend that, by making the foregoing misrepresentations and failing to fully inform potential subscribers of the rules and regulations which govern the Exchange and the subscriber rights which are limited by the rules, the defendants have fraudulently induced subscribers to execute the subscriber's agreement, and therein have engaged in a fraudulent business practice within the meaning of Business and Professions Code section 17200.[11] The plaintiffs contend the defendants must make restitution to the Exchange's subscribers for all funds obtained through the misrepresentations and nondisclosures complained of.

There is no merit in the above claims. As we shall explain, all material representations in the subscriber's agreement are true, and no material facts are concealed.

### b. *The Subscriber's Agreement Contains No Misrepresentations*

It is simply not true that the subscriber's agreement includes misrepresentations regarding subscribers' personal liability for the Exchange's debts. The truth is that, just as the subscriber's agreement states, "No present or future subscriber of the Exchange shall be liable in excess of the amount of his or her premium for any portion of the debts or liabilities of the Exchange." This is so, because, in 1987, the commissioner granted the Exchange a certificate of perpetual nonassessability pursuant to section 1401.5.

The plaintiffs insist that a certificate under section 1401.5 eliminates only a subscriber's liability for assessments by an exchange's attorney-in-fact or the commissioner; they contend the certificate has no effect upon subscribers' contingent liability to unpaid judgment creditors of an exchange. However, a fair reading of the statutes governing assessments (§ 1390 et seq.) and those governing lawsuits against reciprocal insurers (§ 1450 et seq.) demonstrates that this contention is not correct.

In the absence of a certificate of nonassessability, the subscribers of a reciprocal insurer are liable for "all liabilities" of the exchange, including claims, debts and any deficiency in required surplus. (§§ 1391-1392.) Subscriber liability is subject to certain limits which are stated in the statutes and other limits which may be stated in an exchange's power of attorney.

---

[11]We have recently held that an insured can maintain an action under section 17200 and following for acts by an insurer amounting to fraud. (*State Farm Fire Casualty Co.* v. *Superior Court* (1996) 45 Cal.App.4th 1093, 1110-1111 [53 Cal.Rptr.2d 229].)

(§§ 1397-1400.) Whenever the assets of an exchange are insufficient to meet *all* of its liabilities of every kind and maintain the required surplus, an assessment must be made by the attorney-in-fact or by the commissioner. (§ 1391.) Subscribers are required to pay their proportionate share of assessments, except as provided by statute. (§ 1392.)

Contrary to the plaintiffs' argument, nothing in sections 1391, 1392 or the statutes governing lawsuits against reciprocals suggests that liabilities to judgment creditors are not among the liabilities for which assessments must be made. It is quite correct that, if a judgment is obtained against an exchange, and it is not paid within 30 days either out of the exchange's surplus or through an assessment, the judgment creditor is entitled to proceed directly against the subscribers. (§ 1451.) However, a subscriber's liability to a judgment creditor is limited to "such proportion as his interest may appear." (§ 1450.) This limitation logically means that a subscriber is liable for the amount for which each subscriber could be assessed by the attorney-in-fact or the commissioner. For subscribers of exchanges which issue assessable policies, that amount is limited to an amount equal and in addition to one annual premium, or any greater amount which is provided in the exchange's power of attorney. (§§ 1397, 1398; cf. *Mitchell* v. *Pacific Greyhound Lines* (1939) 33 Cal.App.2d 53, 66-68 [91 P.2d 176] [Upon liquidation of the California Highway Indemnity Exchange, subscribers' liability to creditors was limited to the amount agreed upon in the subscribers' agreement, namely an amount in addition and equal to each subscriber's annual premium].)[12] For subscribers of exchanges that are exempt from assessments under section 1401 or 1401.5, there is *no liability* beyond the

---

[12]*Mitchell* is the only case of which we are aware, which considers the manner in which subscriber liability may be enforced by judgment creditors of an exchange. The defendants, who were subscribers of the exchange, contended that any personal liability which they might have to the exchange's creditors *must* be enforced by actions brought by the creditors directly against each subscriber, and could not be enforced through an assessment. (33 Cal.App.2d at pp. 61, 64.) The Court of Appeal rejected this contention and ruled that, under the exchange's subscriber agreement, the then existing statutes governing reciprocals and the then existing liquidation statutes, subscriber liability to exchange creditors, like other obligations, was enforceable through an assessment. (*Id.* at pp. 64-65.) It is even more clear today than it was when *Mitchell* was decided that subscriber liability to an exchange's judgment creditors is one of the obligations covered by subscriber liability for assessments, and is not, as the plaintiffs contend, a distinct obligation unaffected by a certificate of nonassessability. The *Mitchell* court observed that the statute then governing subscribers' contingent liability gave exchanges "the right to limit 'the contingent liability for the payment of losses' but not for other expenses." (*Id.* at p. 60.) The present statutes are more inclusive. Section 1391 provides that assessments must be made when an exchange is not possessed of admitted assets sufficient to discharge "all liabilities" and maintain required surplus. Section 1397 allows an exchange to limit liability for "assessments *under this article* [i.e.. article 6 (§§ 1391-1400.5) of chapter 3 ("Reciprocal Insurers") of part 2 of division 1 of the Insurance Code]. . . ."

subscriber's paid premium for any debts of the exchange, including judgment debts.

The Exchange has obtained a certificate of perpetual nonassessability under section 1401.5. The representation in subscriber agreements executed since 1987, that "no present or future subscriber of the Exchange shall be liable in excess of the amount of his or her premium for any portion of the debts or liabilities of the Exchange," is thus true.[13]

### c. *The Subscriber's Agreement Does Not Conceal Material Facts*

The plaintiffs contend that, because the subscriber's agreement is an insurance contract of adhesion, any limitations upon subscriber rights must be plain and conspicuous, or such limitations will be denied enforcement. (See *Reserve Insurance Co.* v. *Pisciotta, supra,* 30 Cal.3d at p. 808; *Ponder* v. *Blue Cross of Southern California, supra,* 145 Cal.App.3d at p. 719; *Westrick* v. *State Farm Ins., supra,* 137 Cal.App.3d at p. 692; see also *Shepard* v. *Cal. Life Ins. Co., Inc.* (1992) 5 Cal.App.4th 1067, 1077 [7 Cal.Rptr.2d 428].) Plaintiffs claim that the limitations which the subscriber's agreement places upon their rights of ownership and control of surplus are not plain and conspicuous, hence the subscriber's agreement is not binding upon them.

Initially, we note that the plaintiffs are relying upon principles stated in *Reserve Insurance, Ponder,* and related cases, which exist to protect an insured's reasonable expectations of *coverage.* The rights which plaintiffs assert here are of a different character, being more analogous to rights held by a shareholder in a corporation, and it is not clear that the principles stated in *Reserve Insurance* and *Ponder* should apply with the same force and effect to rights other than coverage. However, assuming arguendo that they do, we nevertheless are unable to conclude that the reasonable expectations of Exchange subscribers are frustrated by the matters complained of in this lawsuit.

---

[13]In their reply, plaintiffs assert that the existence of the Exchange's certificate under section 1401.5 *establishes* the *falsity* of the representation that subscribers are not personally liable for Exchange debts. They base this assertion upon language in section 1401.5, subdivision (b), which states that an exchange which obtains an order of perpetual nonassessability "shall no longer be subject to or entitled to the benefits of: subdivision (c) of Section 1307 . . . and Article 6 (commencing with Section 1390) of this chapter." Article 6 provides for assessments; section 1307, subdivision (c) authorizes limits upon assessments. We disagree with the plaintiffs' reading of the provision in section 1401.5, subdivision (b), that article 6 and section 1307, subdivision (c), do not apply to a holder of a perpetual nonassessability certificate. That provision can only sensibly mean that an exchange whose subscribers have *no* personal liability for its debts will have no need to provide in its power of attorney for *limits* to such liability.

There are two limitations upon the enforcement of insurance contracts, adhesion contracts generally, or provisions thereof. First, a contract or provision which does not fall within the reasonable expectations of the weaker or adhering party will not be enforced against him or her. (*Montrose Chemical Corp.* v. *Admiral Ins. Co.* (1995) 10 Cal.4th 645, 669-670 [42 Cal.Rptr.2d 324, 897 P.2d 1]; *California Grocers Assn.* v. *Bank of America* (1994) 22 Cal.App.4th 205, 213 [27 Cal.Rptr.2d 396].) Secondly, even if the contract or provision is consistent with the reasonable expectations of the parties, it will not be enforced if it is unduly oppressive or unconscionable. (*California Grocers Assn.* v. *Bank of America, supra,* 22 Cal.App.4th at p. 213; *Dean Witter Reynolds, Inc.* v. *Superior Court, supra,* 211 Cal.App.3d at pp. 767-768.)

Here, we have already concluded that the challenged provisions of the subscriber's agreement are in accord with well-established principles of law under which the directors of an insurance concern have discretion in the management of surplus funds. It follows that, as the trial court found, the provisions are not unduly oppressive or unconscionable. However, we must consider whether they are within the reasonable expectations of the parties.

The plaintiffs claim that, as subscribers of the Exchange, they have reasonable expectations of distributions of surplus, either as dividends, withdrawal rights upon expiration of their policies, or an interest in Exchange assets upon its dissolution. It is axiomatic that the reasonable expectations of the parties to a contract are defined in the first instance by the provisions of the contract. In this case, that would be the subscriber's agreement. However, the plaintiffs base their claims not upon the subscriber's agreement, but upon matters outside of it. Specifically, they base their claim upon (1) supposed obligations of reciprocal insurers in general, and (2) statements in the Club's representative's manual to the effect that the Exchange is organized as a not-for-profit reciprocal insurer, that premium deposits collected from subscribers are to be at the lowest level necessary to pay losses and expenses and to fund adequate reserves, and that deposits not used for these purposes are returned to subscribers as dividends.

The plaintiffs claim that the subscriber's agreement conceals from potential subscribers that (1) the subscribers of an interinsurance exchange have property interests in the exchange's surplus funds and (2) such property interests of Exchange subscribers are purportedly waived by provisions in the subscriber's agreement by which subscribers agree to give the Board discretion over the management of surplus. The plaintiffs further contend that the nondisclosures in the subscriber's agreement are exacerbated by the

fact that the Exchange's rules and regulations are not provided to prospective subscribers except upon request, and the Club's sales personnel do not discuss them. Thus, unless a subscriber makes extraordinary efforts, he or she is kept unaware of ownership rights of subscribers in the Exchange's assets and is likewise kept unaware of rules 26 and 27 in the Exchanges rules and regulations, by which subscribers' ownership rights are allegedly forfeited. Finally, the plaintiffs contend that potential subscribers are misled and confused by the placement of the signature line on the form which serves both as the Exchange's application for insurance and as its subscriber's agreement. The plaintiffs complain that the text of the subscriber's agreement and the signature line appear on separate pages, with the result that many potential subscribers do not read the subscriber's agreement or even notice that they are executing such an agreement. The plaintiffs claim that, through the combined impacts of the material nondisclosures in the subscriber's agreement, the failure of Club personnel to inform potential subscribers of Exchange rules and regulations, and the misleading placement of the subscriber's agreement signature line, consumers are deceived into believing they are only purchasing insurance and never realize they are in truth becoming participants in an insurance enterprise in which they have an interest as owners as well as insureds.

The above contentions are without merit. First, the claims based upon general law are mistaken. As we have observed, the plaintiffs' claim that reciprocal insurers generally have an obligation to return surplus to their subscribers is based upon a misunderstanding of the nature of a California reciprocal insurer, as presently defined in the Insurance Code. Whatever may have been the case in the past, California reciprocal insurers of the present day have no obligation to disburse accumulated surplus to subscribers or to maintain it in a form which can be withdrawn by subscribers upon departure from the exchange. Under the Insurance Code, disbursements and withdrawal rights are entirely at the discretion of the insurers' directors. (§ 1420.) Where the plaintiffs have no withdrawal rights or rights to disbursements of Exchange surplus under general laws governing reciprocal insurers, they can have no reasonable expectation of such rights, and there is no basis for claiming they were fraudulently induced to waive them. Secondly, the plaintiffs cannot legitimately claim rights based upon the Club's representative's manual, which describes the Exchange's vision of itself as a not-for-profit enterprise and its aspirations to distribute to subscribers surplus that is not needed to maintain adequate reserves. The manual is an internal document, is not intended to be communicated to potential subscribers, and makes no promises to them.

In truth, the reasonable expectation of one who executes a subscriber's agreement with the Exchange is that he or she is purchasing insurance and

*may*, in the discretion of the Board, receive dividends or other distributions. Plaintiffs do not complain that they have not obtained the coverage for which they bargained.[14] Instead, they contend that, in addition to the bargained-for coverage, they are entitled to the distributions which are plainly designated in the subscriber's agreement as discretionary. However, they allege no factual or legal basis for such entitlement.

In sum, under the law governing reciprocal insurance companies, all representations in the subscriber's agreement are truthful, and the plaintiffs' objectively reasonable expectations of insurance coverage based upon the agreement have been met. There is thus no basis for the plaintiffs' argument that they were fraudulently induced to execute the agreement and are therefore not bound by it. For the same reasons, the plaintiffs have not established either that the subscriber's agreement is fraudulent, or that the Exchange's management of surplus is unlawful within the meaning of Business and Professions Code section 17200. The trial court thus correctly sustained the defendants' demurrers.

### 4. *Leave to Amend*

 Finally, the trial court properly sustained the defendants' demurrer without leave to amend. An order sustaining a demurrer without leave to amend is unwarranted and constitutes an abuse of discretion if there is a reasonable possibility that the defect can be cured by amendment (*Aubry* v. *Tri-City Hospital Dist.*, *supra*, 2 Cal.4th at p. 967), but it is proper to sustain a demurrer without leave to amend if it is probable from the nature of the defects and previous unsuccessful attempts to plead that plaintiff cannot state a cause of action. (*Krawitz* v. *Rusch* (1989) 209 Cal.App.3d 957, 967 [257 Cal.Rptr. 610].) Plaintiffs have had three opportunities to amend their complaint and have been unable to successfully state a cause of action against the defendants. Moreover, the defects in the complaints have not been defects of form. Rather, the problem is that plaintiffs seek judicial intervention in management decisions as to the level and form of surplus funds of the Exchange. Under well-established rules devised in enterprises to which the Exchange is sufficiently analogous, these matters lie within the discretion of the Board and management of the Exchange, where these institutions act in good faith. The plaintiffs having failed to allege facts which tend to establish an absence of good faith and reasonable inquiry, no cause of action exists by which the defendants' actions can be challenged.

---

[14]Nor, as the trial court observed, do the plaintiffs complain that they are charged an unreasonable rate for their coverage.

## DISPOSITION

The judgment of dismissal is affirmed. Costs on appeal are awarded to the defendants.

Kitching, J., and Aldrich, J., concurred.

A petition for a rehearing was denied December 2, 1996, and appellants' petition for review by the Supreme Court was denied January 22, 1997.